## BRIDGES *v.* SHELDON and others.

*(Circuit Court, D. Vermont. January 6, 1880.)*

1. STATEMENT OF FACTS.

A., B., and C. severally held contracts with the United States for the supply of head-stones and blocks for soldiers' graves. A. purchased B.'s contract for $20,000, giving four notes on time for the amount, and also bought C.'s contract, S. & S. becoming security for the payment of the purchase money, upon A.'s offer of a bonus, in three propositions, of $3,520.32. A. purchased stone of S. & S. for his own contract and for C.'s contract, at agreed prices, but, on becoming assignee of all the contracts, A. made a written proposition to S. & S. that they should furnish the marble for all the contracts, and the means to carry them on, receiving one-third the profits, guarantied to be to them at least $20,000. S. & S. assented in writing: "the price heretofore agreed upon for head-stones and blocks is not to be considered as included in the $20,000 mentioned; * * * full agreement, in accordance, to be hereafter executed;" to which was added, over the signatures of A. and S. & S., that "the full agreement, referred to above, may be modified and made so as to fix the compensation of S. & S. by a definite price per head-stone and block in addition to the price heretofore agreed upon; this, in lieu of the one-third interest, but not of the given sum of $20,000." The contract, drawn in pursuance thereof, provided that S. & S. should receive certain increased prices for head-stones and blocks, and "for interest and commissions on advances, and for their services in and about said business, 9 per cent. per annum" on the advances until repaid, and 9 per cent. per annum on the prices of stones, 60 days after shipment, until paid; that the stones should "be and remain the sole and absolute property" of S. & S. until set up in the cemeteries; that S. & S. should furnish the "necessary machinery and machine shops, except said blast machines and rubbers. They shall also keep the same in repair;" that all moneys due from the government should be paid to S. & S., under powers of attorney from A., and that, "as soon after final settlement and payment with and by the government as reasonably may be," S. & S. should pay over to A. the balance remaining in their hands after deducting their com-

pensation, interest, and advances.   Suit in equity was brought by A. against S. & S. for such balance, and, upon exceptions to the master's report to whom the cause was referred, it was *held :*

**2. EFFECT OF NEW UPON OLD' CONTRACT.**

The defendants cannot retain the bonus of $3,520.32 for indorsing A.'s paper.   The contract subsequently drawn up between the parties, while embracing several of the subjects of the former contract, made no provision as to its effect on this item, and to that extent superseded it.

**3. AMOUNT OF RECOVERY BY PURCHASER OF NOTE AT DISCOUNT.**

The defendants having purchased for themselves, and being now holders in their own right of the notes of A. to B., are entitled to be allowed their face value, $20,000, although they paid B. but $13,000 for them, and although A. supposed that the purchase was made in the service of their mutual and respective interests, and that only what was paid for them would be charged as an advance under the contract.   Even if the defendants had expressly told A. that they would buy the notes and let him have them for what they cost, it is difficult to see where there is any consideration to bind them to do it.

**4. CONCLUSION OF MASTER NOT WARRANTED BY THE FINDING—REVISION OF FINDING BY COURT.**

The master having disallowed the defendants' claim of $20,000 stipulated profit, exceptions thereto were sustained, it appearing that, although the master found the fact that the full agreement, in fixing the prices for stone, provided an increase large enough to cover the $20,000, he did not find any agreement of the parties to so include it. On recommitment the master found that the parties so agreed, and the court refused to review his finding.   The court will not revise a finding of the master, upon disputed questions of fact, determined as matters of fact upon conflicting testimony.

**5. CONSTRUCTION OF CONTRACT.**

The defendants are not entitled to any allowance for repairs on machinery furnished and operated by the orator.   The contract that defendants shall furnish necessary machinery and machine shops, except blast machines and rubbers, and keep the *same* in repair, construes itself further on, in the same connection, by declaring that the orator shall only be liable to pay for certain specified things, not including repairs.

**6. LOSS MUST FALL ON EQUITABLE OWNER OF THE PROPERTY LOST.**

A cargo of the stone having been lost while in transit to its destination, the loss must fall on the orator, the equitable owner of the stone; not on the defendants, who were owners for their own security merely, and beyond that held the legal title for the orator's benefit.

**7. RATE OF INTEREST DETERMINED BY THE LEX LOCI CONTRACTUS — INTEREST NOT DUE ON MONEY DETAINED UNDER TRUSTEE PROCESS.**

The contract being made in Vermont, the orator could recover at most only 6 per cent., the legal rate of interest in that state; and it

appearing that after payment by the government, and during attempts at settlement between the parties, the balance due the orator from defendants was attached on trustee process, and still remains under the attachment, the defendants are not liable for any interest, since the detention was not wrongful, and the money due did not constitute an interest-bearing debt at the time of the attachment.

8. EFFECT OF OPENING JUDGMENT—"INTEREST," AS COMPENSATION FOR SERVICES, VALID THOUGH USURIOUS.

The question of interest having been opened by the exceptions of defendants to the master's allowance of interest to the orator, the question of the allowance of interest at 9 per cent. to the defendants is opened, though no exceptions were taken thereto by the orator. Such allowance is valid, though interest above 6 per cent. would be usurious and void, because the finding of the master is conclusive that the extra 3 per cent. was a *bona fide* compensation for services of defendants not otherwise compensated, and not a mere cover for usury.

9. TIME FOR FILING EXCEPTIONS.

The month given by the rule of court for filing exceptions does not begin to run until there is a report on file to which exceptions can properly be addressed.

10. APPORTIONMENT OF COSTS—CHARGES OF STENOGRAPHER NOT TAX-ABLE COSTS.

Both parties having prevailed and failed to some extent, upon the items disputed and litigated, the costs will be apportioned according to the relative importance of the items in dispute won and lost by the respective parties, and the time and expense spent upon each. The charges of the stenographer procured by the master, to take down the oral testimony of witnesses upon the hearing before him, are not part of the taxable costs of suit.

11. SERVICE OF SUMMONS UPON LITIGANT, WHILE UNDER PROTECTION OF AN ORDER OF THE MASTER, A CONTEMPT OF COURT.

One of the defendants having gone to Iowa to attend the taking of a deposition, under order of the master, the orator caused service of summons to be made upon him, in a suit in the state court, for same cause of action involved in this suit. *Held,* such action was a contempt of court, whether so intended or not, and the suit having been removed to the federal courts, a stay of execution in this suit, until evidence of the discontinuance of the Iowa suit was filed, was granted the defendants, and they were allowed the expenses of such suit, including reasonable counsel fees, imposed as a fine against the orator.

## In Equity.

A suit in equity for an account against the defendants for moneys which complainant claimed respondents had collected for his use from the government of the United States, for

work done under contracts with the United States, whereby
Bridges, as contractor, and as assignee of other contractors,
had agreed to erect marble head-stones for soldiers' graves.
The contracts were let by the secretary of war, in December,
1873, to four contractors: Samuel G. Bridges, Thomas P.
Morgan, and C. S. Jones, each about one-third of the head-
stones for the graves of known soldiers, and to De Witt C.
Sage, blocks for the graves of unknown soldiers. Jones re-
fused to perform the part of the contract let to him, and it
was again let to Morgan. After the contracts were let, and
before December 18, 1874, Bridges became the assignee of
the contracts of Sage, had purchased a part of Morgan's, and
had made a conditional contract with Morgan for the pur-
chase of the balance of Morgan's and Jones' contracts.

Bridges began purchasing stone from Sheldons & Slason,
of Rutland, Vermont, to fill his contract, in April, 1874, at
$1.25 per stone; and in October, 1874, upon becoming as-
signee of Sage's contract, made an agreement with Sheldons
& Slason to furnish stone for that contract at 81 cents per
stone. In order to purchase the contract he had to give
security for its performance, and Sheldons & Slason became
the security upon an offer by Bridges to give a bonus in
three propositions of $3,520.32. He agreed to pay for stone,
furnished under the Morgan and Jones contracts, $1.30 per
stone. On December 18, 1874, Bridges made a proposition
in writing to Sheldons & Slason, proposing that they should
furnish the marble for all the contracts, and the means to
carry them on; and proposing to give them one-third the
profits—guarantying profits to them to be at least $20,000.
Sheldons & Slason accepted the proposition in writing as fol-
fows:

"The price heretofore agreed upon for head-stones and
blocks is not to be considered as included in the $20,000
mentioned in this as above. We assent to this proposition;
full agreement, in accordance, to be hereafter executed.

"SHELDONS & SLASON.

"The understanding is that the full agreement referred to
above may be modified and made so as to fix the compensa-

tion of S. & S. by a definite price per head-stone and block, in addition to the price heretofore agreed upon. This, in lieu of the one-third interest, but not of the given sum of $20,000.                            S. G. BRIDGES.

"SHELDONS & SLASON."

Bridges, in purchasing Morgan's contracts, gave him four notes, of $5,000 each, payable five, seven, nine, and eleven months after December 24, 1874, respectively, secured by an order on the government for payment out of four of the cemeteries assigned. These cemeteries were not completed, and there was no possibility of completion at the times the notes were due; and in May, 1875, Morgan having proposed to take from Bridges $15,000 for the $20,000 of notes, Bridges made application to Sheldons & Slason for the advance of so much. Charles Sheldon went to Washington, and upon seeing Morgan offered to give $10,000 for the notes instead of $15,000, which Morgan refused to accept. Sheldon increased the offer to $13,000, and would give no more. Thereupon Bridges, without the knowledge of Sheldon, gave his note to Morgan for $2,000, and thus made up the $15,000 demanded by Morgan; Sheldons & Slason giving notes for $2,500, $2,500, $4,000, and $4,000, respectively; and Morgan gave up the notes to Sheldon, Bridges not being present. Sheldon required Morgan to indorse the notes to Sheldons & Slason.

On May 20, 1875, a contract was drawn up in pursuance of the proposition of December 18, 1874, (Bridges meantime having completed his contract with Morgan so that he had all the contracts to fill,) between Bridges and Sheldons & Slason, dated back to December 18, 1874, wherein Sheldons & Slason agreed to furnish marble, means, power, and machinery necessary to fulfil the contracts; Bridges to do the work necessary to finish the stone, and erect them in the cemeteries. And under the contract the prices for head-stones were increased so that Sheldons & Slason were to receive for head-stones furnished under Bridges' contract, $1.41 per stone; under Morgan's and Jones' contracts, $1.46 per stone; and under Sage's contracts, 90 cents per block, and six cents commission upon each stone purchased from others, and to

receive 9 per cent. interest on advances until repaid, and 9 per cent. interest on the price of stones, 60 days after shipment, until paid.

It was agreed that all moneys paid by the government under the contracts should be paid to Sheldons & Slason under powers of attorney from Bridges. After paying themselves, compensation for stone, advances and commissions, they were to pay the balance remaining in their hands to Bridges, and until the stone were set in the cemeteries they were to remain the sole and absolute property of Sheldons & Slason. The contracts were completed in June, 1877.

In June, 1875, a cargo of stone loaded in the schooner Almaretta was lost off the Bahama islands. The cargo was in part loaded on deck. The policy of insurance was an ordinary marine policy. No extra premium had been paid for deck loading. After the loss the insurance company returned the premium and refused to pay any insurance. The cargo was a total loss. Complainants claimed the loss should fall on respondents under the contract, and respondents claimed the loss should fall on complainant.

The cause was referred to a master to hear and determine.

The other necessary facts appear in the opinion.

*Gillmore & Anderson* and *Prout & Walker*, for orator.

*Daniel Roberts* and *W. H. Smith*, for defendants.

WHEELER, D. J. This cause has been heard on the report of the master, evidence returned therewith, exceptions by the orator and the defendants respectively, and arguments of counsel. The exceptions, especially those of the defendants, are too numerous to be conveniently treated and understood by their several numbers or in numerical order. The items to which they apply, so far as separate reference to them is either necessary or deemed to be proper, are taken up somewhat in the order in which they are presented by the report.

1. As to the item of $3,520.32 for indorsing paper and meeting liabilities, presented for allowance by the defendants. This item is made up of three sums, severally offered in writing by the orator to the defendants, for indorsing some and guarantying other of his paper, and furnishing him stone

upon credit, to be retained out of the avails of his contracts with the government received into their hands. Each sum was offered in connection with the furnishing stone by the defendants, or by others, at stipulated prices, for filling his contracts, and was accepted in that connection. Afterwards a new contract was made between them, by which the defendants were to receive a larger sum for the stone furnished by them, and a commission on the stone furnished by others in the same connection, and by which an appropriation was made of the avails so received by the defendants from the government. This advance in price exceeded one of the sums, and the advance and commission probably nearly equalled and perhaps exceeded, each of the others, although exactly how the others would compare is not easily ascertainable. However they might compare, the parties took several of the subjects of the former contract and embraced them in the latter upon new terms, without expressly providing what the effect upon the subjects of the former not embraced in the latter should be. The latter must stand because it is the later act of the parties. With the latter contract standing, the former cannot be carried out as it was made in respect to those sums composing this item. So the new contract superseded the old to that extent. The defendants could not, consistently with the new contract, retain those sums out of the money received from the government, and they are not now entitled to have it allowed to them out of the balance of that or other money of the orator in their hands. The exceptions to the disallowance of this item are overruled.

2. As to item of Morgan notes, $20,000, admitted $13,000. Morgan held four of the orator's notes, of $5,000 each. They were given upon good consideration, negotiable, and, so far as appears, just. Before they were matured the defendants purchased them, and they were indorsed to the defendants. The defendants paid $13,000 for them. They are brought into this accounting without objection, and the only question is whether the defendants shall be allowed their face or only what was paid for them. As they were valid and negotiable,

the defendants, or any one, had good right to purchase them on any terms they could agree upon with Morgan, and to hold them for their full amount against the orator, and by so doing they would infringe upon no right of his. He owed them, and all the right he had was the right to pay them according to their terms when due, so long as they should be outstanding. He could purchase them himself, or procure any one else to do it for him, upon any terms he could make. He did not purchase them himself for himself: the defendants purchased and took them. If the defendants purchased them for him, he has the right to stand upon their purchase according to its terms, as if he had done it himself. If they purchased them for themselves they had the same right to hold the notes for their full face after the purchase that Morgan had before. And if they had it then they have it yet, for there is no pretence that the notes have been paid since, otherwise than by being charged in this account. So the question is whether the defendants purchased them for themselves or for the orator. The defendants became interested to purchase them because they wished to avoid the consequences of the efforts Morgan would make to collect them; but their interest to get control of them has no tendency to show that they did not buy for themselves. It would rather show the contrary. They did not hold out to the orator that they were purchasing to hold for themselves at their full face, and it was not necessary that they should. There was no duty resting upon them, nor would there be upon any purchaser, to consult or inform him at all. Nor were the intentions of the defendants, or of the member of their firm doing the business, of importance, unless made known to the orator, and in some way acted upon to his detriment, if not carried out.

The master finds that the orator supposed that the purchase was made in the service of their mutual and respective interests; that what was paid for them would be charged as an advance under the contract, and that he was warranted and justified in so supposing from the circumstances, and the

course and consummation of the transaction. If this should mean that he was given to so understand by the defendants, then they would be bound by the representation so far as it would bind them; but the master does not say that, nor that they were responsible for the circumstances, course, and consummation from which he so understood. What they gave him to understand is afterwards expressly stated in the report to have been, that they were buying the notes to aid and favor him, and that he would realize a pecuniary saving as the result. This, apparently, was true. The notes in the hands of Morgan were a great embarrassment to the orator, and to have them transferred to the defendants, who would be interested not to embarrass him with them, was doubtless a favor to him, and a saving from pecuniary loss. The language of the report is careful and exact, and it nowhere goes so far as to say that the defendants undertook to buy these notes for the orator. But, even if they had expressly said to the orator that they would buy the notes and let him have them for what they cost, it is difficult to see where there is any consideration to bind them to do it. He gave them nothing for buying the notes. He exerted himself to bring about the result, but he was at work for himself, and not for them. He gave his own note for $2,000 to Morgan to induce him to sell to the defendants, but he did not do it at the request or by the procurement of the defendants. He did that to procure Morgan to sell. Nor was he deceived into giving this note by the conduct of the defendants. He deceived them by keeping that fact from them, not they him.

It is argued that the orator has a right to the notes for what they cost, because, it is said, that the defendants paid them with his money. But this is not true in fact. The defendants paid for the notes with their notes, and paid their notes with their own money. They had no money of the orator's then, nor have they had since, to apply on payment for these notes, except that now in controversy. The very question here is about how that money shall be applied, because it has not been applied before. Considerable stress

is laid upon the method of keeping the books, as the payment of the note of the defendants first due, given for these, was entered as an advance. But the others were not entered so, and, when further entries were made, the amounts of the orator's notes were entered as advances. These entries were all apparently irregular. But the irregularity of book-keeping should not vary the rights of the parties, nor affect them otherwise than as evidence of how the matter was understood by those making or directing the entries. In this case the making these entries is explained by the evidence. As this item stands upon the report and evidence, these were valid notes against the orator. They are now held by the defendants in their own right. The orator has never paid them, and they are entitled to hold them and have them reckoned at their face. The exceptions to the disallowance of the balance of $7,000 are sustained, and the whole item is allowed.

3. As to the item of $20,000, stipulated profit, presented for allowance by the defendants. The claim for this item grew out of a proposal in writing made by the orator and accepted in writing by the defendants. The effect of the proposal and acceptance is a matter of law arising upon the instruments. There is no question but that the defendants were to have, in some manner, $20,000 as an inducement for their undertakings. They had been furnishing stone at stipulated prices. The orator proposed that they should continue to furnish stone, and also that they should furnish buildings and power for finishing and handling them, and means for carrying on the business, and offered them one-third of the profits, which he would guaranty would be $20,000. They said thereupon that the price theretofore agreed upon for stone was not to be considered as included in the $20,000, and assented, and provided that a full agreement in accordance should be thereafter executed. Then they added that the understanding was that the full agreement might be modified and made so as to fix the compensation of the defendants by a definite price for stone, in addition to the prices theretofore agreed upon, "this in lieu of the one-third interest, but not of the given sum of

$20,000." The parties afterwards fixed an increased price to be allowed to the defendants for stone, and inserted them in a full agreement. The master has considered that, by the terms of the writings of acceptance, "upon such increased prices the defendants were to realize $20,000 as profits, in addition to what they would get for the stones furnished at said original prices; and, if such increased prices should give said $20,000 as such profit, that would answer their entire right as to profits." And he has found that, when the parties fixed the increased price for the stone, they provided an increase large enough to cover this $20,000, and has disallowed the item, the stone being reckoned at the increased price. If these conclusions are correct, or if the fact is that the parties provided for the $20,000 by the increased price, the item was properly disallowed, whether the construction put upon the writings is the true one or not. But this construction does not seem to be the true one. The acceptance is, expressly, that the *compensation* of the defendants was to be fixed by a definite price in addition to the former price, to be in lieu of the third interest, but not of the $20,000 which they were to have. They were not to have any third interest, but were to have the increased prices as compensation for the increase of their undertakings, and the $20,000 as profit. This is the construction put upon these writings in the orator's bill of complaint. Upon the construction of the master, his finding of fact as to providing for this profit in the increased price is manifestly correct. If it was to be provided for in the increased price, it would follow directly that when they increased the price they provided for it. In the view here taken the question of fact would be different. The starting point is different, and there would be more space to cover to reach the same result. Proof sufficient to establish that the parties agreed to distribute the $20,000 to the prices of the stone, or to substitute an increased price of stone for that gross sum, would be necessary, in addition to proof of the fact that increased prices were fixed. The master has not found such agreement. The fact that they made such dis-

tribution or substitution would show that they agreed to make it, and the master has found that fact. But this finding rests upon the supposition that they had agreed to make it, and, with that supposition removed, the finding might not follow. It will not do to infer the fact from the agreement, and the agreement from the fact.

This case in this respect is similar to *Briggs* v. *Briggs*, 46 Vt. 571. There the auditor appears to have supposed that a sister could not recover, for services rendered to her brother, without an express promise to pay, or its equivalent, and thereupon, from the fact, that the services charged for were rendered without request or claim of compensation at the time, to have found that they were performed without expectation of payment, and to have disallowed the charges. But the court disregarded this finding as springing from an erroneous supposition, and, as the services were valuable, and were rendered within the knowledge of, and without objection by, the brother, she was allowed to recover for them. Here it is not at all clear that, had the master proceeded upon the basis that the court does, he would have come to the conclusion that he did. That he might not is the more obvious from a consideration of the evidence. There is no pretence that the substitution was made at any time except on the occasion when the full agreement was filled up and executed. What was done, then, as to this $20,000, rests wholly in the parol testimony of the orator and J. B. Smith, his clerk, and that of the defendants Charles Sheldon and John A. Sheldon, except some figures on loose pieces of paper. Neither the testimony of the orator nor of Smith tends to show any proposal to change what had been done about the $20,000, nor any negotiation in the direction of distributing it upon the prices of the stone instead of leaving it in a gross sum; and the testimony of the Sheldons is that no allusion whatever was made to it. The figures have among them $20,000, and show calculations upon the number of stones to be furnished at rates producing about $20,000. But this can only be deduced from them by examination and study, and the testi-

mony of the orator and Smith is that the figures were not made in the presence of the Sheldons, and that they were not examined and studied by either. So, while there was ample evidence to show that the $20,000 was put on to the prices of the stone, if that had been agreed to be done, there is far less evidence to show it was then agreed to be done. The exceptions to the disallowance of this item are sustained.

4. As to item for machine repairs — $1,071.93. These repairs were made by the defendants to machinery furnished and operated by the orator to perform work that he was to perform. The question made, as stated by the master, is whether, by the terms of the contract between the orator and the defendants, he or they were to make such repairs. There is not enough reported, or that appears, to vary the provisions of the contract in regard to them. The defendants were to furnish the necessary machinery and machine shops, except said blast machines and rubbers, and also keep *the same* in repair. If this were all, the plain meaning would be that they were to keep the same machines they furnished in repair. But the contract proceeds further in the same connection, and construes itself by declaring the meaning to be that the orator should pay only for certain specified things, not including repairs. Taken altogether, the contract seems to require the defendants to make these repairs. The orator's exceptions to the *pro forma* allowance of this item are sustained, and the item is disallowed.

5. As to item upon the Almaretta loss — $2,320.20. Some of the stone were shipped for their destination on the schooner Almaretta. The orator undertook to get them insured, but failed to perfect any valid insurance. The vessel and cargo, including the stone, were lost. The question is as to which of these parties should bear the loss of the stone. By the provisions of the contract the defendants were to be the legal owners of all the stone until they should become the property of the government under the contract with the government. But, according to the spirit of the whole contract, they were owners for their own security, merely, and beyond that held

the legal title for the orator's benefit. He was the equitable owner, subject to their claim. Their security is made good otherwise. The loss fell upon his equitable right, and not upon their legal title. It came without their fault, and he has no just claim that they should make it up. It must be borne where it fell. The exceptions to the disallowance of this item are overruled.

6. As to interest. The master *pro forma* allowed interest at the rate of 9 per cent., according to a computation made for the orator. The defendants have excepted to this allowance. The contract was made in the state of Vermont, and the business between the parties was transacted in Vermont, and the laws of Vermont are to govern. According to these laws the rate is 6 per cent. No more than that can be collected, and if more is paid the excess can be recovered back. No agreement for more adds anything to the right, however strongly it may be expressed, for it is unlawful. It is clear that the allowance of 9 per cent. in favor of the orator is contrary to law and cannot stand. There was not even any agreement that he should have 9 per cent., or interest at any rate at all. The money in the hands of the defendants was held in a fiduciary capacity, and was not, by the terms of the contract, to be paid over until as soon after final settlement with and payment by the government as reasonably might be. It would not bear interest until after that reasonable time had elapsed, and perhaps not then, before demand. *Haswell* v. *Farmers' & Mechanics' Bank*, 26 Vt. 100; *Hauxhurst* v. *Hovey*, Id. 544. No demand is found, and the allowance of 6 per cent. for some of the time for which interest at 9 was computed would seem to be improper. The exceptions of defendant to the allowance of interest, as it was allowed, are sustained.

The orator has not excepted at all to the allowance of interest, and insists that it should stand without variation except as the items are varied. It is insisted in argument in behalf of the orator that if the subject is opened on the exceptions of the defendants, and a different method is adopted, giving only 6 per cent. to the orator, the legal rate should be applied to

the defendants. This seems to be his right. He might be satisfied and not wish to except if the whole should stand, and not if it should be charged against him. It is usual, where a judgment is opened on exceptions by one party, to render judgment, if one is rendered, according to law, although it may be favorable to a party who has not excepted. This opens the question as to what interest the defendants are entitled to. By the contract they were to have 9 per cent. upon advances from the time made, and upon the price of stone furnished after 60 days, until re-imbursed. This is expressed to be for their services; but compensation was provided for them in the increased price for the stone. As before remarked, and as was held by the master, the property was held by the defendants for their security merely, and so were the assignments and powers of attorney under which they acquired the right to the money from the government, and their money when that was obtained. Their advances were for and their sales were to the orator, and there was no contingency about their right to repayment for the risk of which the extra interest could be taken. Besides, it was not expressed to be for any such thing. It was for the forbearance of money, really, and mingling it with other things would not deprive it of that character. Under the law of Vermont, as construed by the highest court of the state, extra interest on advances made by the treasurer of a corporation, under a contract that he was to have it in connection with other compensation for his services, was usurious. *Waite* v. *Windham Co. Mining Co.* 37 Vt. 608. The defendants are entitled to interest on their advances, and on the price of the stone furnished, after 60 days, because it was so agreed, but the rate must be at 6 per cent., for that is all the law allows.

The other exceptions are either to the findings or failure to find in respect to circumstances not directly affecting the results, or are not well founded in view of the evidence and findings thereupon, or are wholly immaterial, so that none of them are sustained. They are too numerous to warrant

specific reference to them in detail, and are all of them over-ruled. These considerations and conclusions furnish a basis for disposing of all the items and questions in this case, except those remaining in respect to, or resting upon, the item of $20,000, and the computation of interest, when all items are settled.

The answer admits and claims the effect of the proposal and acceptances to be that the defendants were to have that sum for entering into the arrangement, as alleged in the bill; but denies that the payment of it was provided for in the increase of prices agreed upon. The traverse of the answer raises an issue of fact as to whether or not payment of it was so provided for. Issues of fact made by the pleadings in equity are usually triable by the court, upon evidence taken for that purpose. In this case, by consent of the parties, an account was ordered to be taken by the master, and returned with the evidence, without any trial by the court of that or any issue. Taking the account would include trying all questions of fact involved with the items. This $20,000 is an item of the account, and this question of fact was directly involved in adjusting it. As before shown, this question was not tried by the master upon so broad an issue as the plead-ings, and the construction of the writings adopted left open; and as the case now stands it is still open and undetermined. As the question was one proper to be determined by him on the evidence taken before him, it would probably be within the province of the court, in the exercise of its power of revision over the report, to determine it now, upon the evidence returned by him. But the parties provided for sending the case to the master in a manner which would carry this question of fact there for trial, with others. The master has heard the evidence upon it thus far adduced, and can take more, if necessary, in order to determine the ques-tion properly. It is more usual to send such questions, so situated, back to the master, than for the court to determine them upon the evidence returned. And then the proof, in some degree, tends to show that the parties never came to

any mutual and full agreement as to whether the $20,000 should be, or was, covered by the increase in prices, or was left to stand by itself; and that the orator supposed it was so covered, and the defendants that it was not. If in any event it should be found that the parties failed to agree about that, then a further account would become necessary, which would require sending it to the master again. It would leave the defendants entitled to that sum aside from the increase of prices, because they were entitled to it by the terms of the proposal and acceptances, and they would never have parted with that right, nor have agreed to accept, nor accepted, anything else in place of it. It would also leave the matter of the increase of prices without being fixed by any agreement of the parties in which their minds met, for the orator would suppose they were agreeing to one thing and the defendants to another, and they would not mutually agree at all to the same thing.

The defendants, when they started to agree about this, were entitled to the $20,000, and an increase of prices besides, sufficient to cover their increased outlay for labor, machinery, power, and space, and whatever else they were to and did furnish, that they were not to at the former prices. If the new prices covered both, payment of them pays both. If the defendants did not agree that it should cover both, they are entitled to the $20,000, and an increase of prices to cover their increased outlay now. If the increased prices were agreed upon to cover the increased outlay only, then they are entitled to them as agreed, and the $20,000. If they understood the increased prices excluded the $20,000, and the orator that they included it, then there was no meeting of minds, and consequently no agreement that was binding upon either, as to the increase. In that event the defendants would be entitled to that sum as an item by itself, and to such an increase of former prices as would justly and fairly compensate them for their additional undertakings and performances under the contract by which the prices were to be increased. This increase could only be determined by taking an account of

these additional matters and things, and what the defendants would reasonably deserve to have for furnishing them. Thus the case might have to go to the master, if the court should undertake to find that issue made by the pleadings. It seems better to send all these questions to the master, to be acted upon by him as shall be found necessary in completing the account, which will be more in accordance with the consent of the parties and the practice of the court.

The report, in respect to the item of $20,000, and the matters connected therewith, and the evidence thereupon, and the computation of interest, is recommitted to the master.

---

*(Circuit Court, D. Vermont. May Term, 1880.)*

WHEELER, D. J. The master has now, pursuant to the recommitment of his report to him, found, without further hearing, that the parties did agree to divide up the $20,000 presented as an item for allowance by the defendants, and distributed it to the price of such stone in making the contract executed May 20, 1875, and filed an amendment to his report accordingly.

The orator insisted that the report, as it stood before, showed such a finding, and the defendants that it did not; but the defendants filed exceptions applicable to it in that aspect, and the questions arising upon those exceptions have been fully argued. The amendment is considered to be a part of the report, as if it had been made before the exceptions were filed, and the questions arising in respect to it, as argued, are considered to be open for determination now. These questions depend upon whether the finding of the master upon the issue in respect to that item shall stand as found, or be reviewed by the court upon the evidence taken before the master.

There is no doubt about the power of a court of equity to revise the report of a master by supplying facts material which are shown by the evidence, but not stated in the report,

by setting aside the findings of facts not shown by any evidence, or which are contrary to the evidence, and when errors in law have controlled or influenced the finding of material facts; but this revisory power of the court has never been considered as covering a right for a party to appeal from the master to the court upon disputed questions of fact, determined by the master as matters of fact upon conflicting testimony. *Green* v. *Bishop*, 1 Cliff. 186. The question here is purely one of fact; it arose upon the pleadings, and either party might have had it tried and determined upon evidence taken, according to the usual course, before the cause went to the master. The cause went to the master by consent, without this issue being tried; it has now been tried and determined as a question of fact, arising upon conflicting testimony, by him. To review his decision upon it now would be a rehearing of it upon, in effect, an appeal; and more, it would be allowing the party to come back to the court for the trial of a question voluntarily taken from the court to the master. Such a course is not according to the well-settled practice in such cases. The parties have had a full trial and decision of the question by the master, after his attention had been directly called to its controlling importance in the views of the court. To disturb his conclusion would be a departure from the usual course, which the court would not be warranted in taking, and to which neither party would be entitled. The exceptions to the disallowance of this item are overruled.

The computation of interest upon the items and balances, as they now stand allowed and disallowed, at the rate allowed, remains to be made. It must be made under the supervision of the master, or of the court. The reports do not furnish means for causing it to be made by the court readily. The cause is, therefore, recommitted to the master for the purpose of having the computation made. No order has yet been made as to costs. If any question is to be made about costs, upon any questions before the master, as at the hearing it was suggested there might be, the cause is also recom-

mitted for the finding of such facts as may be applicable to such questions in respect to costs before the master, as may be made before him.

Reports recommitted accordingly.

---

*(Circuit Court, D. Vermont. December 21, 1880.)*

WHEELER, D. J. This cause has been further heard upon the second additional report of the master, the motion of the orator to dismiss the defendants' exceptions thereto, the questions raised by the exceptions, and the questions presented as to interest. The motion to dismiss the exceptions is founded upon the fact that they were filed more than one month after this report was filed. The report as filed, however, was not completed so that any final decree could be made upon it. There were still open questions in regard to interest for the master to act upon, and it was immediately recommitted to the master for completion. The parties supplied the facts necessary to complete the report by stipulation, which was filed to take the place of a further report. The exceptions were filed within one month after this stipulation, by its terms, became a part of the files in lieu of the requisite report. After the report was recommitted it was in suspense, and there was no report on file to which exceptions could properly be addressed. The month given by the rule for filing exceptions would not begin to run until there was such a report, or something equal to it, to take its place. The stipulation took its place when, by its terms, it was to, and not before. The month began to run when that time came, but did not run out before the exceptions were filed. They were filed within the rule, and could not properly be dismissed.

The exceptions relate to the item of $20,000, and to interest. The only question as to the former is whether the finding of fact by the master shall stand. He has found the fact, upon which the allowance of that item depends, dis-

tinctly against the defendants. He has done this upon con-
flicting direct evidence of witnesses taking part in the trans-
action in question, and upon like conflicting evidence as to
circumstances transpiring afterwards bearing upon the same
question. Two witnesses state, under circumstances bear-
ing more or less upon their credibility, that this item was
disposed of in a way that it should not remain to be allowed
to the defendants, and two others that it was not; witnesses
testify that after the business was done the parties adjusted
so much of it between themselves that there was not room
left for this $20,000 as an existing claim, and that the
defendants agreed to pay the balance, so far as adjusted, at
the rate of $1,000 per week, and entered upon such pay-
ments; while others, with equal knowledge and positiveness,
deny that what was agreed to and done would exclude the
$20,000. It is upon such evidence that the finding has been
made. The defendants could not, with plausibility, and do
not, claim that the finding is wholly without evidence to sup-
port it, but do claim that it is against the great weight of
the evidence bearing upon it. Neither do they show or claim
to show that the master was actuated by partiality, or other
wrong motive, otherwise than by showing that, upon the evi-
dence before him, his conclusions were wrong. They insist that
the finding is clearly wrong, and that the court should, for that
cause, retry the question, or send it to another master to be
retried. It is not thought to be necessary to say more about the
power and duty of the court in such cases than has already
been said in this case. The power of the court to set aside
a report of a master is unquestioned, but it is not to be exer-
cised capriciously, or otherwise, but for good cause; and mere
differences of opinion as to the weight of evidence, when they
exist, do not constitute good cause. Perhaps other masters
or the court, if charged with the duty of finding this fact,
would find it differently, but that does not furnish sufficient
ground for setting aside the report and essaying such a trial
to see what the result would be. That would be a mere ap-
peal from the master to the court, or another master, which
is clearly not allowable. There is no warrant in authority

or practice for such a course in this case. The question was brought properly before this master. He has decided it upon such grounds that the court cannot, without the exercise of unusual or extraordinary powers, disturb his decision. The responsibility of it was, by consent of the parties, cast upon him, and must rest with him, and they must abide the result. *Harding* v. *Handy*, 11 Wheat. 103.

The questions in respect to interest relate to the rate at which interest is to be reckoned in favor of the defendants, and to whether they are to be charged with interest, and, if so, from what time. These questions have been somewhat under consideration before, but without the aid of much argument of counsel, and without attention being drawn to important facts bearing upon the subject stated in other parts of the report than that devoted expressly to it. By the terms of the contract between the orator and defendants they were to advance money, and furnish marble slabs and blocks, to enable him to fulfil his contracts with the government, and were to draw the money on the contracts by powers of attorney from him, and were to be allowed and to retain out of the money so received sufficient to repay themselves for their cash advances, and to pay for the slabs and blocks with commissions, and for their services 9 per cent. interest on advances, and on the price of slabs and blocks, after 60 days. The orator insists that this is, on its face, usurious, and that only 6 per cent. should be allowed. The defendants claim that the effect of this contract is such that there was no debt from the orator to the defendants which could be enforced, and that therefore there was no forbearance of money, and nothing that could properly be called interest; and that the stipulation for 9 per cent. was a mere mode of fixing their share in the adventure, or that it was a provision for compensation to some extent for what they were to do; and that if its character was doubtful its allowance by the master is, in effect, a finding as a matter of fact that it was not unlawful interest, but a compensation for something else.

The contract makes no provision for payment to the defendants but by the money drawn from the government; but,

still, what the defendants were to do in furnishing money and materials was to be done for the orator, and to be paid for by money drawn in his name, and if payment from that source should, for any cause not attributable to the defendants, fail, upon common principles underlying the whole transaction the orator would be liable as upon an implied promise for what the defendants had done for him. It was upon this ground, that all was done for the orator upon such security as the powers of attorney and the retention of title to the property afforded, that the orator was made to bear the Almaretta loss. But, by attending carefully to what the master says about the item of $3,520.32 for indorsing paper and meeting liabilities for the orator, and the item of $5,000 for services of Charles Sheldon, as well as what he says about the item of interest specifically, it is plain that he regarded the extra 3 per cent. as a compensation to that extent for many things to be done by the defendants for which no compensation was otherwise provided. As to the latter, he finds expressly that if what Sheldon did was within the prerogative and scope of the contract, compensation therefor is provided in the 9 per cent.; and elsewhere, under the item of overpayment of Jacobs, he finds that the course taken by the defendants involving these services was adopted in good faith, to avoid danger of loss to both parties. In *Cockle* v. *Flack*, 93 U. S. 344, 10 per cent. interest was stipulated for on money advances to move products to be sold by one party or the other, on commission to be paid to the party making the advances. It was held that the contract was not necessarily usurious on its face, and still might be a mere cover for usury on the advances, and that it was properly submitted to the jury to find what its real character was. So, here, this contract is not necessarily usurious. The extra 3 per cent. may be a cover for usury, and may be for just compensation. To determine which it is, involves a question of fact. The master, after finding as stated, has allowed the 9 per cent., and no exception has been taken to this finding. His finding, under these circumstances, must be taken as conclusive.

The defendants were to pay over to the orator what might

remain in their hands, after paying themselves, as soon after final settlement with and payment by the government as reasonably might be. Such settlement was had, and payment to the defendants made, in May or June, 1877. This is as definite as the report fixes the date. Thereafter efforts were made by the parties to close up the business between themselves. While these attempts at settlement were in progress, trustee processes were commenced against the orator in the state courts, demanding damages in all to the amount of $24,000, with costs, two of which were served July 13th, and a third October 9, 1877, by attaching the goods, effects, and credits of the orator in the hands of the defendants, which were pending at the time of hearing. The facts as to these trustee processes appear from the concession of counsel in open court and from the answer of the defendants. This suit was brought March 23, 1878. The question is whether the defendants, under these circumstances, are chargeable with interest on the funds in their hands, and, if so, to what extent.

There was no provision in the contract between the parties that the defendants should pay interest to the orator. The money in their hands belonging to him did not of itself constitute an interest-bearing debt. It would become such only upon their agreement to pay interest for its forbearance, or upon a detention of it, which was wrongful. No agreement to pay for forbearance or request to forbear, from which such agreement might be implied, appears. They have not paid the money, but have detained it. If the detention was wrongful, they are chargeable with interest; if justifiable, not. The money was attached in the state court, and this court could not interfere with that attachment. The proceeding in the state court, commenced before this suit was, must be respected. *Taylor* v. *Carryl*, 20 How. 583. The pendency of the trustee process would not prevent a suit by the orator to have the amount of his claim ascertained and adjusted. Gen. St. Vt. 312, § 41; *Spicer* v. *Spicer*, 23 Vt. 678; *Jones* v. *Wood*, 30 Vt. 268. This court has concurrent jurisdiction with the state court of such a suit on account of the citizenship of the

orator. Rev. St. U. S. § 629. But, when brought, the relief to be obtained can be no greater than he would be entitled to in a similar suit in the state court. *Ewing* v. *St. Louis*, 5 Wall. 413. In the state court, although the orator might proceed to judgment or decree for the amount his due, there would be no enforcement of either while the trustee suits were pending. *Morton* v. *Webb*, 7 Vt. 123; *Hicks* v. *Gleason*, 20 Vt. 139; *Jones* v. *Wood*, 30 Vt. 268.

The orator could remove these attachments by satisfying the claims of the plaintiffs and procuring the suits to be discontinued, or by substituting bonds for the attachments, without affecting the claims they were brought to secure, if he preferred that course. Laws of Vt. 1869, No. 42. The detention of this money from the orator, while he left it to be so held that he had no enforceable claim to it, cannot in any just sense be held to be wrongful. Perhaps they would have continued to hold it if the attachments had been removed; but, if they would, and he wished to cast the responsibility upon them of holding it wrongfully, he should have taken care that proceedings against himself, which he could control, should not so stand as to enable them to hold it rightfully. Where a debt is attached which is bearing interest at the time of the attachment, the interest may continue to run as an increment of the debt, and be held by the attachment with the debt, or be recovered by the payee if he removes the attachment. *Adams* v. *Cordis*, 8 Pick. 260. But if it does not bear interest at that time, detention of it afterwards, during the pendency of the attachment, will not subject it to interest. *Prescott* v. *Parker*, 4 Mass. 170; *Oriental Bank* v. *Tremont Ins. Co.* 4 Met. 1; *Lyman* v. *Orr*, 26 Vt. 119. At the time of these attachments the parties had neither settled, nor failed in the attempt to settle, the multifarious claims growing out of the transactions involved, and clearly there had been no default then, on the part of the defendants, which would convert this into a debt bearing interest. On principle and authority both the defendants are not yet chargeable with interest.

Questions are made about costs, and have been heard.

The defendants did not object to a decree for an account, and that decree was entered and the master appointed by consent. Both parties have prevailed and failed to some extent upon the items disputed and litigated, and far enough so that an apportionment of costs seems proper. Upon consideration of the items in dispute won and lost by the respective parties, and the time and expense probably spent upon each, it seems most just that the orator be allowed five-sevenths of his costs, and the defendants two-sevenths of theirs.

There is also a question about the charges of a stenographer being a part of the costs. A stenographer was engaged by the parties to take down the oral testimony of witnesses upon the accounting before the master. The master has certified that this was done by his procurement as master, and that the charges should be taxed as costs of the accounting. It does not appear that the parties agreed that these charges should be so taxed. Whether they can be or not depends upon the authority of the master to make such charges taxable. The master has, under the equity rules, very large discretion about the production of testimony and the order of examination of witnesses and of procedure before him, but these charges are not made taxable fees or costs by either the statutes or rules, and the question is whether the master can make such charges taxable when the law has not made them so. The court cannot employ a stenographer at the expense of the government, neither could it at the expense of parties without their consent, nor allow one to do so at the expense of another, by requiring the expense to be treated as taxable costs. The authority of the master cannot exceed that of the court appointing the master. These charges are left to be borne by the parties according to their contract without being taxed.

While the accounting was pending before the master, the orator procured an order from the master for the taking the depositions of witnesses before a commissioner named at Keokuk, Iowa, and caused notice to be given to the defendants that the depositions would be taken, under the order, on a day named, at 10 o'clock in the forenoon, at that place.

Pursuant to the order and notice, one of the defendants went to Keokuk for the purpose of attending upon the taking the depositions, and was there on the morning of the day named, when at 15 minutes before 10 o'clock the orator, by his attorneys there, who were also acting as his attorneys in this cause here, caused process by summons to be served upon him in a suit in the state court of Iowa in favor of the orator against these same defendants, upon the same contract and cause of action involved in this suit. The defendants filed in this cause a motion for an attachment as for contempt, to which the orator appeared and avowed the bringing the suit there, and an intention to prosecute until that cause or this should be ended; but alleges that he had no expectation that any of the defendants would personally attend the taking the testimony, nor intention of bringing the suit there at the time of procuring the order and giving the notice. This motion has been heard on argument of counsel. This order for the taking the testimony was one which the master was fully authorized to make by the provisions of equity rule 77. The privilege to parties to judicial proceedings, as well as others required to attend upon them, of going to the place where they are held, and remaining so long as is necessary and returning wholly free from the restraint of process in other civil proceedings, has always been well settled and favorably enforced. It is mentioned in the Year Book, 20 Henry VI. 10, and enforced to protect not only the body of a suitor from arrest, but his horse and other things necessary for his journey, which would otherwise be attachable, by the custom of London, from seizure for debt. Bac. Abr. "Privileges," 4, 17, 55; Sellon's Pr. 123; *Meekins* v. *Smith*, 1 H. Black. 636; *Norris* v. *Beach*, 2 John. 294. It extends to every case where attendance is a duty in conducting any proceeding of a judicial nature, (Bac. Abr. "Privilege," B 2; 1 Greenl. Ev. § 317;) to attending upon an arbitrator under a rule of court, (*Spence* v. *Stewart*, 3 East, 89;) upon commissioners in bankruptcy, (*Arding* v. *Flower*, 8 T. R. 534;) to witness giving a deposition under an order of court, (1 Greenl. Ev. § 317; *U. S.* v. *Edme*, 9 Serg. & Rawle, 147;) and to a party inquiring after

evidence under leave of court, (Bac. Abr. "Privilege," B 2.) The privilege arises out of the authority and dignity of the court where the cause is pending, and protection against any violation of the privilege is to be enforced by that court, and will be respected by others. *Hurst's Case*, 4 Dall. 387. A writ of protection issued out of that court is proper, but is not necessary, except for convenient and authentic notice to those about to do what would be a violation of the privilege. It neither establishes nor enlarges the privilege, but merely sets it forth, and commands due respect to it. *McNeil's Case*, 6 Mass. 264; 1 Greenl. Ev. § 216.

In *Hall's Case*, 1 Tyler, 274, a writ was actually issued. It commanded all civil officers, and other persons, to abstain from executing or serving any civil process upon the body. The court said that the object of the privilege was that the person should not be drawn into a foreign jurisdiction, and there be exposed to be entangled in litigation, far from his home, which must ever be attended with augmented expense, and that the writ suspended all civil process against him. The service made in that case was by arrest, which was common at that time, but an exposure to service by summons would be equally an exposure to distant and vexatious litigation, and within the mischiefs mentioned by the court. A party who could not attend to his suit without being liable to such service, would be under personal restraint from which those engaged in the administration of justice have a right to be free. *Halsey* v. *Stewart*, 1 South. 366.

In *Miles* v. *McCullough*, 1 Binn. 77, the defendant, while attending that court, was served with a summons at the suit of the plaintiff, and moved that the service be set aside upon the ground of privilege. The plaintiff contended that he was privileged from arrest alone. The court said that it had been repeatedly ruled that he was equally privileged from the service of a summons, and set the service aside. This service, so near the time of commencement of proceedings, was probably in the constructive presence of the authority acting under the order, which would of itself be a contempt. *Blight* v. *Fisher*, 1 Pet. C. C. 41. It was imposing upon the defendants

the defence of litigation there, from which they had the right to be free, by those who knew all the facts on which the exemption rested. Bac. Abr. "Privilege," B 2. The most difficult question is whether they can have relief here. It is said that this court has no jurisdiction over the proceedings in a state court, which is true. The statute regulates this. Rev. St. U. S. § 720. *Watson* v. *Jones*, 13 Wall. 679. But this statute did not prevent the United States circuit court from releasing a defendant from process out of the supreme court of Pennsylvania, violating its protection. *Hurst's Case*, 4 Dall. 387. The object is not to restrain proceedings in the state court, but is to prevent abuse of the privileges of this court. This proceeding, of itself, has no relation to the subject of litigation in the state court, but rests upon the fact that a litigant in this court has been drawn into litigation there in violation of the protection which all courts furnish to litigants before them, without regard to the subject of that litigation. That subject has been alluded to merely to show full knowledge on the part of those engaged. The proceeding rests upon the idea that what was done was a contempt, which the court should punish. 1 Greenl. Ev. § 216; *McNeil's Case*, 6 Mass. 264. Still, this court, as are all federal courts, is limited in its power to punish for contempt. Their power extends only to misbehavior in presence of the court, or so near as to obstruct the administration of justice, or of officers of the court, and to disobedience or resistance to any lawful writ, process, order, rule, decree, or command of the courts. Rev. St. U. S. § 725.

The master was acting under the authority of the court when he made the order. A disturbance of the master's proceedings would have been a contempt of the court; and, had any one undertaken by force to prevent the defendants from attending the examination of witnesses ordered, probably no one would contend it was not a contempt. This interference was of the same nature; still, it is not punishable as a contempt unless it was done in disobedience of, or resistance to, an order of the court. This does not mean a written order always, but only an exercise of authority, con-

stituting a requirement. Had a writ of protection issued, as one might, there would have been no question but that there was an order to be regarded. But, as before shown, the actual existence of such a writ neither makes nor adds to the protection. The order to take testimony issued under the authority of the court carried with it the protection of the court from the service of foreign process in attending the taking. That protection was an order. *McNeil's Case*, 6 Mass. 264. The service of the process was a disobedience of the order. The service of the process in *Hall's Case* was denominated a disobedience of the writ, in the opinion of the court. 1 Tyler, 274. The conduct of the orator constituted a contempt of the authority of the court, whether it was so actually intended or not. The spirit and intention of the statute, if not the letter, warrant and allow punishment for it in the manner provided by statute. It is argued that it should extend to requiring that suit to be discontinued, but the statute only authorizes punishment by fine or imprisonment. It appears that the suit has been removed to the federal courts. Had the service been made of process from those courts, it would, on motion made in season, have been set aside. *Steiger* v. *Bonn*, 4 FED. REP. 17; *Sugar Refinery* v. *Mathiesson*, 2 Cliff. 304. And perhaps it would have been in the state court. Whether such proceedings have been had as to make it too late to make such motion now, does not appear of record. It is due to the proper administration of justice that the suit should be ended before the orator has relief here. This can be accomplished now by stay of execution until that suit is discontinued, without violating the statute against staying proceedings in a state court. In view of the circumstances, it is deemed proper that the orator should make good to the defendants all expenses incurred by them in consequence of that service of process, and that execution in his favor in this case be stayed until evidence of the discontinuance of that suit is filed.

The exceptions are overruled, the report is accepted and confirmed, and a decree ordered for the orator for the amount due, allowing interest at 9 per cent. on balance due the defendants,

with five-sevenths of the orator's costs, after deducting two-sevenths of the defendants' costs, and the expenses to the defendants of the suit in Iowa, including reasonable counsel fees, to be taxed by the clerk, which are allowed as a fine against the orator, with a stay of execution until evidence of the discontinuance of that suit is filed.