**In re PORTLAND ELECTRIC POWER CO.**

B–23986.

No. 1065.

United States District Court,
D. Oregon.

Sept. 16, 1947.

See also D.C., 97 F.Supp. 857.

Clarence D. Phillips, Portland, Or., for debtor.

Ralph H. King, Portland, Or., for independent trustees of debtor.

Frederick M. DeNeffe, Paul E. Kern, Portland, Or., for Bondholders Committee.

W. Stevens Tucker, San Francisco, Cal., for Securities & Exchange Commission.

Charles A. Hart, Portland, Or., Edgar G. Crossman and Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for Guaranty Trust Co.

Justin N. Reinhardt, Portland, Or., for First Preferred Stockholders.

MacCormac Snow, Harry Beckett, Robert T. Mautz and V. Lyle McCroskey, Portland, Or., for Prior Preference Stockholders.

JAMES ALGER FEE, Chief Judge.

The instant proceeding arises in the reorganization of Portland Electric Power Company, an electric power holding company, which owned all of the capital stock (except qualifying shares of directors) of Portland General Electric Company, a company producing and distributing electric energy, and Portland Traction Company, a company operating a traction line. The long history of the proceedings need not be recited here.

The Independent Trustees of the debtor had formulated a plan for reorganization. Guaranty Trust Company had formulated another plan. Both were submitted to the Securities and Exchange Commission. That body after careful consideration approved the plan of the Independent Trustees. Thereafter owing to the sale of the Traction Company there was a vital change in circumstances, and the plan of the Independent Trustees was modified and amended. Thereupon a hearing was had where Guaranty appeared by attorneys and urged the rejection or modification of the plan previously approved by the Securities and Exchange Commission. The court overruled the contentions and arguments of Guaranty. The court then ordered the amended plan which had been primarily drawn by the Independent Trustees and had been given the imprimatur of the Commission, submitted to the bondholders and

stockholders for vote in accordance with the statute.

The court by order expressly designated the Independent Trustees as the agents who should make the submission. The material which was to be sent out was explicitly specified. The matter sent to the interested parties was a fair presentation and clearly set out the contentions of Guaranty. No objection to the form of submission was made. There was no attempt by Guaranty to have additional matter sent out through the channel of the court. Mailing of this material was made February 28, 1947.

Without permission of, or notification to the court, Guaranty on March 8, 1947 issued to bondholders the statement set out in the margin.[1] Admittedly this memorandum

1. Statement of Guaranty Trust Company of New York as Indenture Trustee with respect to Portland Electric Power Company Reorganization Plan.

The Bankruptcy Trustees of Portland Electric Power Company, a corporation in reorganization proceedings under Chapter X of the Federal Bankruptcy Act in the United States District Court for the District of Oregon, have mailed to the known holders of Income Bonds, Prior Preference Stock, and First Preferred Stock of that corporation, a "Second Alternative Amended Plan of Reorganization, as Amended", pursuant to an order of that Court dated February 6, 1947.

Guaranty Trust Company of New York is Trustee under the Indenture dated as of March 1, 1934, of Portland Electric Power Company, securing $16,-157,600 principal amount of 6% Collateral Trust Income Bonds, which are entitled to participate in the Plan. Reference is made to the Plan and to the other material being furnished by the Bankruptcy Trustees pursuant to Court order, for the details of the Plan, which provides, among other things, that the holders of the $15,807,000 principal amount of 1934 Bonds will receive for each $1,000 Bond and accrued interest from March 1, 1934, $680 in cash and 34½ shares of Portland General Electric Company Common Stock, and that the holders of the $350,600 principal amount of 1937 Bonds will receive for each $1,000 Bond and accrued interest from September 20, 1937, $594.80 in cash and 30 shares of Portland General Electric Company Common Stock. The Plan has been found by the Securities and Exchange Commission and by the United States District Court for the District of Oregon to be fair, equitable and feasible.

At the hearings before the Securities and Exchange Commission and the District Court, Guaranty Trust Company of New York, as Indenture Trustee for the Bondholders, objected to the proposed Plan and urged that it be amended to provide for payment in full in cash of the Bondholders' claims for principal and interest, out of the proceeds of sale of Portland General Electric Company Common Stock, or for the sale of a representative portion of the Common Stock of Portland General Electric Company, such as 15%, to determine the fair market value as the basis for an equitable distribution of this asset among the qualified participants.

The objections of Guaranty Trust Company of New York, as Indenture Trustee, to the Plan, include the following:

(1) In Guaranty's opinion it is not fair, in a reorganization proceeding of this kind, to require the Bondholders to accept Portland General Electric Company stock at an assigned valuation in payment of their claims, when it would be possible to obtain cash for such payment by the sale of the stock (for the purposes of the reorganization proceeding, the stock is valued at $30.50 per share, plus retained earnings since October 31, 1945). In the alternative, the fair current market value should be reasonably determined by sale of a portion of the Portland General Electric Company stock. We disagree with the court and the Commission which have ruled adversely on these points.

(2) In Guaranty's opinion the valuation of $30.50 per share, plus retained earnings since October 31, 1945, placed upon the Portland General Electric Company stock, is entirely too high as demonstrated by the testimony of Guaranty's experts before the Securities and Exchange Commission. In this connection, it should be noted that the market for the 1934 bonds, on March 7, 1947, appraised the value of these bonds at $1,440 bid—$1,460 asked for each bond in the principal amount of $1,000. After deducting the $680 which the Plan provides shall be paid in cash, the bondholder would receive for each 1934 bond 34½ shares of Portland General Electric Company stock. The market, based on the above mentioned value for the 1934 bonds, appraises the 34½ shares at $770 or approximately $22.30 per

was sent out for the purpose of influencing the votes of the bondholders. Unquestionably the statement did influence the vote.

The votes were counted by Honorable Estes Snedecor, Special Master appointed by the court for that purpose. The result

share. While it is not to be expected that the market for bonds of a corporation under Chapter X would equal the amount of the claim, the discrepancy between the amount of the claim and the market appraisal of the cash and securities to be received is too great in the opinion of Guaranty. The Indenture Trustee calls attention to the fact that there is no assurance that this stock will be delivered to the Bondholders promptly in view of pending or possible further litigation. If security prices continue at present levels or decline further, then Bondholders will be clearly unable to realize the full amount of their claims in cash or market value of securities received.

(3) One of the most important factors in any valuation of the Portland General Electric Company stock is the dividend policy of the Company. The Plan of Reorganization as approved by the Securities and Exchange Commission and the United States District Court for the District of Oregon provides that the Court shall designate, as of the effective date of the Plan, eleven Directors to run the Portland General Electric Company until the spring of 1949 when the new stockholders will be placed in position to elect a Board.

The District Court has expressed no opinion as to a dividend rate and it would be most unusual for the Court to attempt to commit the new Board in advance to any rate. It is apparent, therefore, that under the situation as it exists no dividend rate can or will be established until after the consummation of the reorganization and the designation of the new Board by the Court, nor can anyone but the new Board establish the dividend rate.

In this connection, the following factors must be taken into consideration by the new Board of Directors of Portland General Electric Company when it determines a dividend policy:

Portland General Electric Company, for the calendar year 1946, had net earnings of approximately $3,000,000 for the common stock, including certain non-recurring tax benefits. Earnings in excess of $2,600,000 are being transferred to a contingency reserve.

The capital requirements of Portland General Electric Company for the next three or four years are heavy, calling for an expenditure of over $5,000,000 a year.

The power supply situation in the Pacific Northwest has caused a reduction in the power supplied by Bonneville and has made necessary excessive operating expenses occasioned by the runing of the company's own steam plants. The cost of running the steam plants will affect 1947 net earnings. Likewise, both the unit cost and total cost of the power supplied by Bonneville in 1947 may materially exceed that of 1946.

There are uncertainties in the company's tax liabilities since 1939 which must be taken into consideration in forecasting cash outlays over the next three or four years.

In common with the experience of all other businesses, the cost of materials, supplies and labor is on the increase.

(4) By the time the cash and securities can be delivered to the bondholders, the amount due on each $1,000 1934 Bond will probably exceed $1,800, as the amount due at June 30, 1947 will be $1,800. In order that a bondholder may receive the face amount of his claim at that time in cash and market value of Portland General Electric Company stock, that stock must have a market value in excess of $32.50 a share. Bondholders, in making up their minds whether or not to vote in favor of the Plan, should determine for themselves whether Portland General Electric Company stock is likely to sell for at least as much as $32.50 a share.

Under the terms of the Plan, as amended, before the District Court can proceed with confirmation of the Plan, it must be accepted in writing and filed in the Court, by Bondholders holding two-thirds in amount of the total of bonds with respect to which claims are filed and allowed. The Court has ordered that all claims must again be proved, whether or not they have heretofore been filed and proved, in order to entitle Bondholders and other participants to vote upon the Plan. The forms provided by the Bankruptcy Trustees for filing claims and voting upon the Plan may be obtained from Thomas W. Delzell and R. L. Clark, Independent Trustees of Portland Electric Power Company, 922 American Bank Building, Portland 5, Oregon.

The order of the District Court, dated February 6, 1947, provides that all proofs of claim and ballots must be received by Estes Snedecor, Special Master, Room 515, United States Court

was reported to the court upon May 3, 1947. The prior preference stockholders and the first preferred stockholders had voted overwhelmingly for the plan. But the vote of the bonds was balanced rather evenly for and against the plan, whereas two-thirds approval was required for adoption. The inference was that the statement of Guaranty had been effective in producing this result.

Upon receipt of the report of the Special Master as to the result of the vote, the court directed the attorney for the Independent Trustees to present a showing as to the facts and a form of order directing various parties among whom Guaranty and Henry A. Theis as its Vice President were named, to show cause why they should not be punished for contempt. The court also extended the voting time upon the plan. After the hearing upon the citation there were sufficient changes of vote by bondholders to make up the required two-thirds to put the plan in effect.

At a hearing pursuant to the direction of the court, Ralph King, attorney for the Independent Trustees made showing as to the pertinent facts by affidavits and presented forms of orders. Based upon these documents the court determined there was no probable cause shown for the issuance of a citation to any of the parties theretofore named except Guaranty and Theis as its officer. Order to show cause was directed to these alone.

Upon the appointed day testimony was taken. When one of the attorneys who had been advising Guaranty in New York but who has not been admitted here testified that he had advised the officers of Guaranty to take the step, the court added his name to the proceeding. This attorney has had long experience in corporate reorganization and is a member of a firm of high national standing, but those factors do not render him immune from process of the court. The court refused however to broaden the citation to include one of the local attorneys for Guaranty of high standing at the bar of this court. The latter had written certain letters concerning the making of a statement, but the court found it clear that these expressions had nothing to do with the specific action taken by Guaranty. It seems to have been the assumption that the court would not cite an attorney of standing. There should be no doubt that citation would issue to any one whom the court believed was involved. Originally in leaving his name out of the citation, the court acted on the personal assurance given by this attorney to the attorney of the

House, Portland Oregon, on or before April 19, 1947. Guaranty Trust Company of New York, as Indenture Trustee, urges that all holders of Portland Electric Power Company Bonds obtain the form of proof of claim and ballot (together with the Plan of Reorganization as amended, the summary thereof, the Findings and Supplemental Findings and Opinions of the Court and the Commission and related orders) well in advance of April 19, 1947, so that they will be in a position to file claims and vote within the time allowed.

While the proof of claim filed by Guaranty Trust Company of New York can in no way affect the acceptance or rejection of the Plan, it assures Bondholders of their participation in the assets of the Debtor. However, they are bound by the results of the voting, whether they vote or not. The right to vote on behalf of Bondholders rests solely with the individual Bondholders. Bondholders must exercise their own best judgment in this connection.

While the Guaranty Trust Company of New York does not consider the Plan fair and equitable, Bondholders may want to consider that further delays in the consummation of a fair plan of reorganization of the company may not be in their best interests, and that the distribution of cash and stock to them in the near future, if this be possible, may be regarded as more advantageous than the probability of further delay in an attempt to obtain full payment of their claims in cash or otherwise.

It is imperative that all Bondholders file claims and vote on the Plan. As stated above, under the Bankruptcy Act, approval is required only of holders of two-thirds in principal amount of the total bonds for which claims are filed and allowed. Therefore, a Bondholder who is opposed to the Plan and does not file his claim increases the voting power of those Bondholders who do file claims and vote in favor of the Plan.
March 8, 1947.

Trustees that he had had nothing to do with the transaction. This was borne out by a review of the correspondence. This attorney urged in court the view that Guaranty was justified in taking the action both by testimony and in argument. But definite advice to a client to take action, and argument after the event to the court that the client's action was lawful, are entirely different.

■ The testimony showed that the statement was deliberately issued by Guaranty for the purpose of affecting the vote of the bondholders upon the plan. The evidence is clear that the votes of bondholders were so affected. The witnesses for Guaranty disclaim any intention of contemptuous conduct toward the court. The officers say that Guaranty acted in accordance with its duty as Indenture Trustee for the bondholders and that the constitutional guaranty of freedom of speech protected it. Fully half of the bondholders permitted their votes to remain unchanged for the plan even after the statement was issued. To which group of bondholders was Guaranty performing its duty when it suggested that they vote against the plan? This disposes of the argument that Guaranty was fulfilling its trust.

■ The invocation of the fetish of free speech is of no avail here. In judicial proceedings there is no uncontrolled right of speech. The litigant can neither whisper to the judge nor wear placards proclaiming his unfairness. Even a defendant on trial for his life is permitted to speak only at appropriate times and places, under control of the presiding judge. A New York institution as a litigant has no higher privilege in a civil proceeding.

■ Congress specially provided for the transmission of all material to those who have the franchise upon a plan through the medium of the court. The reason is plain. The fairness of the representations could be judicially checked. An effort was thus made to protect investors from circularization by predatory interests. If such programs could be carried on, the standing of the securities of a company in reorganization could be seriously affected. No one is more easily stampeded than the investors in securities which are the subject of court action. While it is true that persons or institutions on the outside of the proceeding might issue statements, these would have little effect on the bondholders or stockholders. Besides a great deal of electioneering and personal persuasion by individuals holding the securities might be expected. The intention of the law apparently was that the court itself should transmit a fair statement and that organized circularization by parties in interest in the litigation should be prevented. If it had been in contemplation of the legislators that circularization of statements by banking houses which are parties to the litigation, and which stand in a fiduciary capacity to security holders of a company in the hands of the court for reorganization, should be permitted, express provision would have been made therefor.

If it be conceded that this was the intention of the legislature, the purpose of the statute would certainly prohibit statements to all the bondholders made by a well-known banking house in a partisan fashion attacking the fairness of the plan submitted after approval by both court and the Securities and Exchange Commission.

The impact of a public statement by a responsible house which is in a position to state the facts is well recognized in financial circles. Indeed control of the market in a specified security may well be affected by a well-timed statement. If a statement such as the one here could be issued the financial standing of a company in reorganization could be seriously affected. The court would be subject to maneuvers by conflicting interests seeking control of a company in reorganization in the manner in which the stock market is at times manipulated. Such attempts to control judicial machinery would tend to bring the court and the administration of law into disrepute. No recitation is necessary to show that no reorganization could ever be accomplished without the consent of an indenture trustee standing in a fiduciary capacity to bondholders if the trustee were permitted to circularize them in opposition to the plan. The evil of such circulariza-

tion is apparent even if the trustee have, as here, no financial interest in bonds or stock, since the power of control alone is of immense value.

The consequences which follow the issuance of this statement might be stupendous. This company has been looted in the early thirties at the direction of powerful financial institutions of eastern money centers. It came into this court for reorganization among the earliest of the debtors who sought relief under 77B, 11 U.S.C.A. § 207. It seems clear that by concealment from the court of the facts, the proceeding may well have been rigged so that the company would be forced into a reorganization court again within a limited time. This result, whether anticipated or not, occurred. It is true that Guaranty had nothing to do with the company until after the first reorganization was commenced. The evidence shows no participation on its part with the manipulation to bring the company back in court. But the evidence shows that Guaranty obtained a favored position in the new reorganization by virtue of the fact that the stock which constituted the sole asset of the parent company was transferred to Kugler and Company, the nominee of Guaranty, before the reorganization petition was filed. The transfer was concealed from the court by the company in the reorganization petition. Guaranty was insistent upon having the transfer made but did not actively conceal the transaction from the court. After the proceeding was instituted, Guaranty exercised the voting rights upon this stock, wholly owned by the company, and has thus chosen the present board of directors for the subsidiary.

This proceeding has been pending eight years and instances almost perfect coordination between an administrative body and a court. The plan of the trustees was passed upon and approved by the Securities and Exchange Commission and the court after careful examination approved the findings and adopted the plan as amended as fair and equitable to all interests involved. Appeal lay by any interested party either from the order of adoption or from an order of confirmation.

The statute unquestionably contemplated that submission in these matters be by order of the court alone.[2] If we say that in order to carry out this statutory purpose the court in its order for submission for vote must expressly enjoin all parties litigant from all action which might sabotage the plan, then the court must be astute to cover all the devices which the ingenious minds of able corporation counsel might suggest after reading the order of the court. Plainly this task is not only futile but impossible.

The suggestion that a New York financial institution has the power to dominate and control a local electric company while in the hands of the court for reorganization and manipulate an election, and thereby block eight years of consistent effort is inconceivable. It must be assumed the court has a power to protect the public interest, to bring an end to the proceeding and vindicate the administrative and judicial processes which have arrived at the result.

■ The stock of the Portland General Electric Company with the exception of proceeds of sale of the Portland Traction Company was the only property of the debtor. The technical considerations which impelled the court to leave with Guaranty and its nominee the physical custody of this property and the franchise as to members of

**2.** 11 U.S.C.A. § 575 "Submission of information to creditors and stockholders after approval.

"Upon the approval of a plan by the judge, the trustee or the debtor in possession shall transmit, by mail or otherwise, to all creditors and stockholders who are affected by any such plan—

"(1) the plan or plans so approved, together with a summary thereof approved by the judge;

"(2) the opinion of the judge, if any, approving the plan, or plans, or a summary thereof approved by the judge;

"(3) the report, if any, filed in the proceeding by the Securities and Exchange Commission, as provided in section 572 of this title, or a summary thereof prepared by the Securities and Exchange Commission; and

"(4) such other matters as the judge may deem necessary or desirable for the information of creditors and stockholders."

the Board of Directors, have been heretofore reviewed. It is enough to say that Guaranty cannot contend that this property is not potentially in control of the court. If this were not true, no reorganization would be possible. As has been pointed out, the value of this stock might be seriously affected and perhaps almost destroyed by false reports as to the condition of the subsidiary. Destruction of value in whole or in part of property is as real whether produced by physical deterioration or by the deterioration in the minds of holders of stocks and bonds or prospective purchasers. The whole purpose of the custody of the property by the court was to effect reorganization and place the debtor where it could pay future debts as these accrued. The bondholders were necessary participants in this effort.

Furthermore Guaranty is a party to this proceeding. Ample opportunity has been afforded to it to present its plans of reorganization to the Securities and Exchange Commission and the court. The court heard argument by Guaranty's attorneys in opposition to the plan of the Independent Trustees and in support of Guaranty's own suggestions as to the alternative plan and the program of disposal of stock so as to pay the bondholders in full. In face of these arguments and plans the court affirmed the finding of the Securities and Exchange Commission that the plan of the Independent Trustees was fair and feasible and directed submission thereof on certain specified material which presented the arguments and plans of Guaranty fairly and fully. It is true this order of the court did not specifically enjoin Guaranty not to submit other material or make public statements for circularization among bondholders. However of necessity such a provision is implicit in the order and the situation. If it were not then every court submitting such a plan would be required to include such an express provision. Indeed since the question has arisen it is better practice to include such a proviso. However, that is a superabundance of precaution. It has always been understood that where a party has been present in court and been accorded an opportunity to present his contentions that it is at least improper and unethical for him to violate the implied terms of an order issued by the court.

If we then arrive at the conclusion that the action of Guaranty is one which should be controlled in the public interest the next problem is what measures can be taken to deal with this breach of recognized standards of conduct by litigants. There are three which suggest themselves (1) contempt proceedings (2) assessment of costs (3) fixing of fees for services of Guaranty and its attorneys.

■ These will be dealt with in reverse order. In considering the case as a whole if the court finds the conduct of Guaranty was a hindrance to a successful reorganization rather than an aid in the progress of reorganization, the court would be empowered to reduce the fees allowable to Guaranty upon that basis. This bridge will be crossed when we come to the allowance of fees. The court does not prejudge the question but merely suggests consideration thereof at the appropriate time.

■ Second, the court would unquestionably be empowered to assess costs of a submission against a party who rendered the proceeding futile. But the bondholders have voted for the plan under the extension of time granted by the court. Therefore it would be improper to assess the costs of submission against a party where the purpose of submission has been subserved.

Third, the question whether the court can control Guaranty, its officers and attorneys in contempt proceedings under these circumstances is made to appear a difficult one by citation of opinions of the Supreme Court which have nothing to do with this situation. It is true the indications of a general trend toward strict construction of the powers of a court to deal with criminal contempts is marked. There the action is punitive. The controlling statute is probably only restrictive of retributive action by the courts in the form of punishment.

■ The power of the High Court of Chancery to compel action or inaction

by a party to an equity suit in order to maintain or restore the status quo ante is really not the power to punish for contempt although in the literature on the subject and in common parlance it is so used. Equity has always acted against the person. Equity has compelled obedience to its process and decrees by restraint of a party through the stages of attachment, attachment with proclamations, commission of rebellion, warrant to sergeant at arms or sheriff to take into custody, and commission of sequestration.[3] The courts of the federal system have succeeded to these powers. Therefore, this court had the power to fine Guaranty or to commit its officers and attorneys until the harm done by its statement was corrected by appropriate measures.

It is urged that the Supreme Court of the United States has completely removed by interpretation the power of the trial courts to punish for contempt. Indeed, it is true that as far as third persons are concerned the trial courts are circumscribed in dealing out summary punishment to those criticizing judges and action of the courts. Here the guaranty of free speech has been uncompromisingly enforced.

However these cases generally deal neither with interference with property in custody of the court nor with parties to the litigation nor with persons directly connected therewith and are confined to criminal contempt. Although we are here primarily concerned with the power of the court to overcome resistance to its orders and to protect property in its custody, consideration must be given to the language of the statute. This is for the reason that many opinions deal with criminal contempt, civil contempt and the inherent power to protect property and control parties to the litigation without accurate distinction. The courts cannot take the position even in a case where the statute is held applicable that parties with impunity may privately or publicly make partisan appeals to the triers of the fact outside of court. A similar principle would seem applicable to appeals to stockholders and bondholders who have the decision as to property in control of the court.

If we refer to the language of the statute,[4] it may be stated at the outset that there is no attempt to hold Guaranty or its officer upon the ground that the issuance of the statement was action in the presence of the court or so near thereto as to obstruct the course of proceedings therein. Neither is there an attempt to classify Guaranty or its agents as officers of the court because of its position as Indenture Trustee for the bondholders.

If there were to be punishment in this proceeding, punishment might well be predicated upon the theory that the statute gives a court power to punish "disobedience or resistance" of a "party" to the "lawful writ, process, order, rule, decree, or command of the said courts."

In the consideration of the question whether there is liability even under this clause of the section, all cases which do not deal with a "party" should be discarded. It has already been shown that Guaranty is not only a party, but a party in a peculiarly favored position in this case.

However, there are two cases which should be discussed, because of the inordinate effect the expressions of the Supreme Court as to criminal contempt are given in situations where these have no application. In the case of In re Sixth & Wisconsin

---

3. Barbour, A Treatise on the Practice of the Court of Chancery, Vol. I, Chap. II, Sec. II, p. 54–75.

4. 28 U.S.C.A. § 385 [cf. 1948 Revised Criminal Code, 18 U.S.C.A. § 401]. "Administration of oaths; contempts. The said courts shall have power to impose and administer all necessary oaths, and to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority. Such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of the said courts."

Tower, 7 Cir., 108 F.2d 538, it was held that one of the bondholders whose interest was directly affected could not be punished for contempt. The bondholder had filed a petition against the plan before submission on which no hearing had been held by the court. Thereafter he circularized the other bondholders with a statement containing the same material. The court indicates that a bondholder had a right to circularize other bondholders who were in the same situation. Likewise it is indicated that the conduct was not forbidden by the order. The previous outline shows that the facts were entirely different here. In any event, this case is not controlling.

In a sound dissent, Circuit Judge Evans pointed out that the jurisdiction of the court in that instance was founded on protection of property in custody of the court.

The Berry case[5] presents an entirely different situation. There after judgment against a corporation, through its counsel, stay of execution was petitioned. The court granted this petition. Thereupon the corporation divested itself of all its property and was rendered execution-proof. The District Court held neither the corporation nor its officers could be punished for contempt. The Circuit Court of Appeals of the Second Circuit affirmed. This court is not bound by that decision and refuses to follow it. In fairness it must be said that the responsibility of the corporation counsel as officers of the court in engineering such a nefarious transaction was not apparently presented.

 With all respect, which is sincere, for the judges who rendered these decisions, they must be regarded as open invitations to chicanery and fraud for litigants and lawyers. Unquestionably when the court commands acts of forbearance, the terms of mandate should be precise. If not, violations established by tenuous construction should be condoned. But this principle upon which the court rested the above determination does not control the case.

The court forgot that execution is its process for taking control of property and that as soon as judgment entered the defendant's property was in a certain sense under its control. The court forgot that definite remedies are given to the judgment creditor where property has been conveyed in anticipation of a judgment.

The court forgot that under the shield of its express order an act contrary to law was done which deprived a litigant of the benefits of a just judgment. After the court had commanded plaintiff not to strike defendant, the latter relying on the order beat the defenseless plaintiff, and all because the judge had not expressly commanded defendant not to take advantage of a situation created for defendant's benefit. The technical learning of Baron Surrebutter concerning special pleading is sound compared to this. Here is a preference for an arbitrary construction in place of common sense. If it be the law, the time has come to write another, "Dialogue in ye Shades".[6]

The spirited dissent of Circuit Judge Charles E. Clark to the above opinion is noteworthy.

It is noteworthy that the Circuit Court of Appeals of the First Circuit has refused to follow this attempt to apply the language of the Supreme Court in dealing with the first section of the act in their incidence upon third persons not parties to other situations which really fall outside the scope of the act or at best are covered by the language of the third section. In Raymor Ballroom Co. v. Buck, 1 Cir., 110 F.2d 207, an execution had been issued against defendant. The treasurer and other employees of the company made off with the receipts which had been in view of officers and defeated levy of execution. This conduct was held improper and the situation was corrected by fine for the benefit of the plaintiff since it was a resistance to process of court. This is sound law.

5. Berry Administratrix v. Midtown Service Corp., 2 Cir., 104 F.2d 107, petition for writ of certiorari granted, 308 U.S. 536, 60 S.Ct. 114, 84 L.Ed. 452, dismissed per stipulation of counsel, 308 U.S. 629, 60 S.Ct. 297, 84 L.Ed. 525.
6. See Holdsworth's History of English Law Vol. IX, Appendix, pp. 417-431.

Where the court is attempting to correct an evil caused by the act of a party or an interference with property which is in custody of the court, the clauses of the act do not apply in any event.

It is generally urged that a court cannot control a resistance to process, order or rule unless the act done is definitely prescribed by the language notwithstanding the fact that the act may have rendered the exercise of the authority of the court futile. An interesting refutation of this argument is found in U. S. v. Shipp, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319, Id., 214 U.S. 386, 29 S.Ct. 637, 53 L.Ed. 1041. There appellant had been tried in the state court, convicted and sentenced to hang. The Circuit Court of Appeals denied habeas corpus. The Supreme Court allowed appeal and ordered that proceedings against appellant be stayed and custody of appellant be retained, pending the appeal. Appellant was lynched. The sheriff who held appellant and members of the lynching mob were cited for contempt. The information was upheld and certain of the defendants held guilty including the state sheriff. Whether this be considered protection of a person under jurisdiction of the court or punishment for resistance to process of the court where no specific prohibition of the particular act committed is therein contained, the principle is the same.

When compulsive process is issued against a person and he is constrained thereby, the courts have gone to great lengths to prevent any one from taking advantage of the situation so created. An example may be found in the case of U. S. v. Zavelo, C.C., 177 F. 536. There witnesses subpoenaed by the United States in a criminal proceeding from outside the state, were served with civil process by the acquitted defendant in an action for malicious prosecution. Notwithstanding this was a criminal contempt, defendant was held liable under the statute. It is noteworthy that no order of the court expressly commanded defendant not to do the act for the reason that no one except defendant had contemplated such a proceeding. This was clearly disobedience to the process of the court.

Perhaps the best statement of the principle involved is found in Bridges v. Sheldon, C.C., 7 F. 17, 45. There in an equity suit an order was obtained from a master for taking depositions in Iowa. Defendant in attendance on taking of these depositions was served with process instituting a civil action in the Iowa state court commenced by plaintiff. The federal court where the equity suit was pending held plaintiff liable for contempt, saying: "The master was acting under the authority of the court when he made the order. A disturbance of the master's proceedings would have been a contempt of the court; and, had any one undertaken by force to prevent the defendants from attending the examination of witnesses ordered, probably no one would contend it was not a contempt. This interference was of the same nature; still, it is not punishable as a contempt unless it was done in disobedience of, or resistance to, an order of the court. This does not mean a written order always, but only an exercise of authority, constituting a requirement. Had a writ of protection issued, as one might, there would have been no question but that there was an order to be regarded. But, as before shown, the actual existence of such a writ neither makes nor adds to the protection. The order to take testimony issued under the authority of the court carried with it the protection of the court from the service of foreign process in attending the taking. That protection was an order."

The courts of chancery have been astute to protect property actually or potentially within custody from deterioration or interference by any one whether party or stranger. This power is inherent in the court which could not otherwise administer justice or protect litigants or the public.

Exemplification of this doctrine can be found in many reported cases. In re Potteiger, D.C., 181 F. 640, it was held that a bankrupt could be held in contempt where after adjudication he turned over property in his possession to one he claimed was the owner even though a turnover order had not been entered. Where property of a bankrupt was under attachment at the time

of adjudication, the referee requested sheriff to hold the property until trustee was appointed. A foreign corporation seized the property upon writ of replevin and shipped it out of the state. It was held the corporation was in contempt. Here there was no written order, but only resistance to the authority of the court. In re Walsh Bros., D.C., 159 F. 560.

Two decisions illustrative of the control of the court over parties, although there was no express direction of an order, are reported as Lord v. Veazie, 8 How. 251, 12 L.Ed. 1067, and Cleveland v. Chamberlain, 1 Black 419, 17 L.Ed. 93. In the first of these it was held that where parties to litigation tendered a fictitious issue in order to obtain an advisory opinion of a court to the detriment of third parties, the moving parties were in contempt. In this case the interests of third parties were jeopardized by the statement of Guaranty, which was a party.

There need be no order which is violated if property potentially in control of the court is interfered with. In Clay v. Waters, 8 Cir., 178 F. 385, a bankrupt had concealed property with his attorney's knowledge. After bankrupt's death, trustee brought a suit alleging the attorney had obtained this property. After decree in trustee's favor, the property vanished. The attorney was held in contempt and imprisoned to force restoration. It was held this was a proper exercise of the court's function. It is there said: "Attention is sharply challenged to the fact that there was no restraining order or specific injunction against the taking and conversion of the property of the bankrupt by this defendant. But the filing of the petition in bankruptcy and the adjudication which followed it embodied in themselves a commanding injunction of the court against the interference of the defendant with and his concealment and removal * * * of any of the property of the bankrupt. * * * the injunction and command of the court against such interference and removal and notice thereof to all the world were embodied in the injunction and issued therewith by the settled law of the land." 178 F. at page 394.

In re Lutfy, D.C. 156 F. 873, is a case where the adverse claimant and his attorney were held in contempt for removing property of bankrupt in the hands of a sheriff, although there was a claim of right of property.

But it seems to be contended, although courts can protect properties physically, that the value thereof can be destroyed if only there is no trepass upon it. But this can be refuted by several cases of which the following are sufficient to point up the doctrine. In re Sowles, C.C., 41 F. 752, is an example. There an attorney represented to the bidders at an execution sale that the writ was invalid and that he would sue any purchasers. For this lowering of the sale price of property in custody of the court he was held guilty of contempt. Yet he violated no express order. But there are yet closer analogies. In re Boyd, D.C., 228 F. 1003 is such a one. In that instance a bidder at a sale pursuant to the order of a referee was induced to withdraw a bid which he had made. This was held contempt, although one of the alleged contemnors was not a party in the case nor an official of the court. "I am constrained to conclude that to secretly buy off an actual bidder at such trustee's sale is an act in opposition to the order of the referee directing the sale, which impedes the trustee in its execution and partially frustrates its primary purpose, and that hence it is properly to be regarded as a resistance thereto, as distinguished from a direct disobedience, coming within both the letter and the spirit of this inhibition of the Bankruptcy Act." In re Boyd, D.C., 228 F. 1003, 1005.

In the instant case, many bondholders were induced to vote against the plan and thereby the property was deteriorated. But the most pointed illustration is found in the case of In re Cameron Shoe Company, D.C. 12 F.2d 103, 104. There Judge McCormick in an able opinion held that those who agreed to control the bidding at a sale of the assets of a bankrupt by a trustee were guilty of contempt. It was there pertinently said: "* * * the gravamen of the offense is the interference with the orderly process of the court, and lies in the attempt to obstruct and impede

a judicial proceeding before the referee by unlawful means", and that the further acts of the contemnors in threatening to be present at the hearing of confirmation "* * constituted nothing less than a conspiracy to interfere with the orderly administration and sale of bankruptcy estates".

Without elaborate analysis of the decided cases, it will be apparent that the federal trial courts have also maintained the power to punish retributively an abuse of process, orders or rules promulgated judicially. This result can be justified by a construction of the statute. But whether that is true or not, when Congress created this court under the Constitution, there was built into the inherent structure all powers necessary to enforce its process and decrees against parties under its jurisdiction and to protect property under its power by appropriate measures. Congress cannot take those powers away where jurisdiction of the subject matter has been conferred, except by the abolition of the court.[7]

"The constitution granted this power to compel obedience to their injunctions, orders, and processes to the federal courts, when it granted to them all the judicial power of the nation. This power is essential to their existence as judicial tribunals. Without it they would be without the means to enforce their orders, without the means to protect themselves against the defiance and the assaults of the reckless and the criminal, without respect, without dignity, and without usefulness." In re Nevitt, 8 Cir., 117 F. 448, 456.

Returning to the situation in the instant case, the above authorities rule the facts here. Guaranty is a party to this proceeding. One of the attorneys advised the action taken. The statement tended to destroy the value of property in the custody of the court. Delay of and injury to other litigants, stockholders and bondholders might well have been accomplished thereby. The law contemplated that the court should have motive power to put through a plan of reorganization.[8]

---

7. Ex parte Terry, 128 U.S. 289, 302, 9 S.Ct. 77, 32 L.Ed. 405; Interstate Commerce Commission v. Brimson, 154 U. S. 447, 489, 14 S.Ct. 1125, 38 L.Ed. 1047.

8. The public policy is remarkably well summarized by the statement of William O. (now Mr. Justice) Douglas, when Chairman of the Securities and Exchange Commission to a committee of Congress when the passage of the present Chapter X, 11 U.S.C.A. § 501 et seq., was under consideration. In relation to 77 sub. b he said:

"The record of corporate reorganizations of the past—and particularly those of the recent depression—is not pleasant. It shows the absolute control exercised over reorganizations by the inside few; it shows the financial well-being of investors and the public sacrificed to the insiders' desires for protection and for further profit. It shows corporations struggling to reorganize for many years; returns denied to investors; labor injured, and business damaged by the resulting uncertainties and instability. It shows that these delays, these futile prolongations of the agony of reorganization, were frequently due to deliberate sabotage by a group which had something to gain and was unwilling to compromise, or to the lack of motive power necessary to draft a feasible plan

and procure its acceptance. The record also shows, with overwhelming proof, that plans of reorganization were frequently dictated by a single interest—by a closely knit inside group; primarily in the interests of that group and of dubious wisdom so far as interests outside the inner circle were concerned. These conclusions have indeed become so generally accepted and so widely known as to be commonplace. These conclusions indicate that something must be done to provide impartial, capable control over reorganizations; to produce impartially fair and sound plans of reorganization; and to provide effective motive power which will lead to the production and consideration of reorganization plans. * * *

"Under the present system, the situation is so completely controlled by the insiders that the hands of persons whose money is at stake—and often even the hands of the court—are tied."

Concerning the draft of Chapter X, he said: "The bill recognizes this weakness in the system. In a variety of ways, it brings the court into association with the facts of the business; it assures that the court will be fully informed; it places in the court power to give impetus to a reorganization—to see that a plan is drafted and that moves are made

The formulation and adoption of a plan could well be frustrated by the action taken. While the court did not expressly command Guaranty not to attempt to prevent adoption of the plan, the order envisaged adoption because of approval by Commission and court. The diminution of the value of the property and reduction to naught of the essential purpose of the court, would constitute resistance to the exercise of authority by the court. Protection of property of litigants committed to it is the rule and order of this court. Resistance of this rule and order is as reprehensible as abuse of or resistance to process.

The first question before the court is not whether measures should be taken against Guaranty, its officers and attorneys. The question resolves itself into whether Guaranty has a disposition to block the orderly course of the proceeding as indicated by this one act. The court explained in the hearing that the key point was not whether this plan was adopted or not. The question on this phase was whether Guaranty had adopted a recalcitrant attitude toward the court and the proceeding which is presently hindering the course of reorganization.

■ In the able presentation made by the officers and the attorneys for Guaranty it is clear there is no present intention of obstructing the proceedings. Guaranty applied for and obtained the permission of the Securities and Exchange Commission to issue the statement. While it seems to the court utterly obtuse to believe that a clearance by the administrative body was necessary at the same time the court which issued the order of submission with a fair and complete statement of the positions of all parties could be entirely disregarded, still the implications from some of the opinions might suggest the conclusion. At present there seems no reason to doubt that according to the expressions of its officers and attorneys the attitude of Guar-anty toward this court is entirely cooperative. The court determines that there is no necessity of compulsive action to carry on the reorganization successfully under present circumstances. And Guaranty did consult counsel. On this circumstance and the testimony as to intent, the court absolves Guaranty and its officers.

The question regarding the attorney who advised this step is next for consideration. If there is no power of the court to protect parties litigant and the public against abuse of process or orders of the court by attorneys, then other expedients must be taken. The court must enact into rule the code of ethics governing the conduct of attorneys before it. When granting an order the court must write into it positive provisions to prevent the party asking for it from taking advantage of its terms. The court in this instance could have so protected the order, as above noted. But this compels the court to bend the mind to devious devices, and to match guile with guile in order to anticipate possible machinations. The court can trust none of the attorneys because just the time the provisions are omitted the situation will be used to advantage because it is said the court has no power to protect it. If we have come to this point, the courts are powerless to administer the law. Congress should repeal the statute so that the court may again control the predatory interests. It is true that a court has disciplinary powers over its own bar.

■ The attorney who, according to his testimony, advised that the statement could be issued and who failed to advise and compel submission to the court, presents a different problem. The striking part of his testimony is that the question of whether the court, which had submitted the proposal to bondholders for vote, should have been informed or asked for approval thereof never occurred to him. Concepts of ethical conduct toward a court should have led a lawyer to the conclusion that the court

---

to get the support of investors; and it gives the court genuine power to see to it that the reorganized company is provided with good management and a sound capital structure. * * * In the public eye, the courts already have the respons-ibility; what the courts need are ample powers commensurate with their actual or ostensible responsibility. * * * "

75th Congress, 1st Session House Report No. 1409, p. 37. Revision of National Bankruptcy Act H.R. 8046.

was entitled to notice before the entire foundation of the submission by the court was shaken. The advice was improper.

However, there are considerations worthy of note. The attorney is not admitted to the bar of this court. Guaranty brought him into this jurisdiction and submitted him to the control of this court in order to justify his employer. The court might not have been able to reach the lawyer if he had not come here under compulsion to assist his client. Guaranty has been absolved and therefore the attorney is absolved also.

See also D.C., 97 F.Supp. 857.

The logic of the foregoing opinion forces us to the conclusion that besides compelling action by the party, the court has the power of punishing the corporation, its officers and the attorney who gave the advice, for criminal contempt, under the last clause of the statute, for interference with property in the lap of the court and for resistance to the order of the court and the law in the premises. But if the dignity of the tribunal was offended by the action taken it is now fully assuaged by the assurance of all involved, and the contempt is purged. Besides the order of citation by its terms would probably have led all to believe that the court was going no further than to overcome resistance to its order and process. Therefore the court will not proceed to a determination of whether a criminal contempt is here involved.

The rule to show cause is discharged reserving power to consider the record herein in other connections.