226 F.2d 804
 DONOVAN & SCHUENKE, Horace F. French, Ralph A. McClure and A. E. French, Appellants,
v.
Paul W. SAMPSELL, Trustee of the Estate of Ridgecrest Development Co., bankrupt, L. E. Seversen, L. M. Vreeland, D. J. Miller and Paul Freedman, Appellees.
 No. 13396.
 United States Court of Appeals Ninth Circuit.
 May 10, 1955.
 Rehearing Denied June 21, 1955.
 
 Ernest R. Utley, John Van Aalst, Los Angeles, Cal., for appellants.
 Craig, Weller & Laugharn, Frank C. Weller, Hubert F. Laugharn, Thomas S. Tobin, Los Angeles, Cal., D. J. Miller, Burlingame, Cal., Johnston, Baker & Palmer, Bakersfield, Cal., Charles E. Taintor, Los Angeles, Cal., L. M. Vreeland, Pasadena, Cal., L. E. Seversen, San Bernardino, Cal., for appellees.
 Before STEPHENS and FEE, Circuit Judges, and McCORMICK, District Judge.
 JAMES ALGER FEE, Circuit Judge.
 
 
 1
 This is an appeal from an order of the District Court affirming an order of a Referee in Bankruptcy refusing to set aside a sale to D. J. Miller of property of the bankrupt estate of The Ridgecrest Development Company, a corporation, of which he was President. Appellants contend Miller acted in a trust capacity for the officers of the bankruptcy court, and therefore the sale to him was void.
 
 
 2
 The Ridgecrest Development Company, a corporation, was adjudged a bankrupt in May, 1947, and the proceedings were referred to Referee Bergman and later to Referee McGugin.[1] Paul W. Sampsell, an experienced and able officer, was appointed Trustee[2] the following month. D. J. Miller, L. E. Seversen and L. M. Vreeland were President, Vice-President and Secretary, respectively. The corporation owned, at the time of bankruptcy adjudication, a tract of land at the desert town of Ridgecrest, California, near a United States military base, and some rental town structures including a theatre which had been erected upon the property.
 
 
 3
 On January 13, 1950, the Ridgecrest property was sold to Miller, lately resigned as President[3] of the bankrupt, for $131,000.00. The sale was confirmed January 23. Miller was given extensions of time to pay the purchase price of the property, which he had resold to one Freedman before he bid. He finally put up all the money, and the sale was completed in August of the same year.
 
 
 4
 On September 17, the present appellants, who were creditors of bankrupt, petitioned the Referee to set aside the sale on the ground that it was void. Answer was filed by the Trustee, and a hearing was had. The Referee filed findings, conclusions and an order denying the relief prayed. Upon review, the District Court affirmed the order, and this appeal was taken.
 
 
 5
 The attack upon the order was not made in the time specified by statute, and therefore the affirming order might have been absolute,[4] unless the sale was void, in which event neither the sale nor the order confirming would be immunized.
 
 
 6
 Issue: Whether or not a sale of real property is void when made from the bankrupt estate to an agent of the Trustee employed to sell such real property.
 
 
 7
 There are three questions in the case: (a) Whether the cooperation of the officers of the bankrupt corporation and the eventual purchaser from Miller, whose name was Paul Freedman, indicated a conspiracy which would render the sale void. (b) Whether Miller was a "referee, receiver, custodian, trustee, marshal, or other officer of the court," whose purchase would be criminal and inferentially void under 18 U.S.C.A. § 154. (c) Whether Miller, by virtue of his employment by the Trustee under orders of the court, was a fiduciary and the sale void under the general principles of law.
 
 
 8
 The various methods of employment of Miller as an agent of the Trustee of the bankrupt estate, of which he was still President, will not be reviewed now. Prior to the first employment, the Referee had said that he was not going to appoint any officer of the bankrupt corporation as an agent of the court, but Miller actually was compensated as such agent on his own insistence from the time the Trustee took office. The Trustee thereafter attempted to make a sale of assets on five different dates before the sale of a great part thereof was confirmed to Miller in January, 1950. On December 8, 1947, January 3, 1948, May 4, 1948, October 4, 1948, and April 23, 1949, there were abortive efforts to sell. Finally, it was sold on January 13, 1950, to Miller. A previous sale had been confirmed on May 4, 1948, to Nathan King for $136,500.00, subject to real estate broker's commission of $6,500.00, or a net of $130,000.00. This sale was opposed by the bankrupt corporation by filing a review of the order of the Referee, with the concurrence of Miller, Seversen and Vreeland, officers of the corporation at that time. Upon the hearing of petition for review thereof, on June 7, 1948, a bid was made by Joseph Gottlieb in the amount of $140,000.00, but Gottlieb refused to go through with the sale. From May 12, 1947, throughout 1948 and part of 1949, Miller, Seversen and Vreeland, as officers of the bankrupt, maintained that the assets should and could be sold for $200,000.00. Throughout this whole period, in support of this contention, they opposed the attempted liquidation sales by the Trustee.
 
 
 9
 Miller, Seversen and Vreeland were present on January 13, 1950, when the property was sold by the Referee to Miller. Miller asked the Referee if he could be a purchaser, and the Referee said "Yes." When the high bid of $131,000.00 was made by Miller, he was asked if it was a personal bid or made on behalf of the corporation for the benefit of the stockholders and whether Miller would turn the property over for that price on reorganization. Miller answered "No." There was testimony from which it might have been found that one of principal creditors of the bankrupt was on the ground and prepared to bid $135,000.00 in cash for the property, which was a sufficient amount to pay off the "unsecured claims, the creditors, at one hundred cents on the dollar." After a conversation in which Miller took part, he decided it was unnecessary to make that bid.
 
 
 10
 Miller secured the consideration as follows: $10,000.00 down payment was secured from Seversen; about $96,000.00 from Paul Freedman, the ultimate purchaser; the balance from Seversen in cash and cancellation of $13,600.00 encumbrances. As a part of the bid and the sale, Miller had entered into an agreement with Freedman, before making the bid, to take and receive title by paying Miller $50,000.00 in cash, $50,000.00 secured by trust deed on the property sold, and Freedman was to convey to Miller three pieces of property the value of which, according to the findings of the Referee, was $39,000.00.
 
 
 11
 A mere recital of these facts indicates that there was ample ground for the creditors of the corporation to question the validity of the transaction. The clouds of suspicion certainly gathered ominously around the situation. No one has questioned the honesty and integrity of the Referee and of the Trustee. Both of these officials are spoken of highly. But it must be remembered that Miller, Vreeland and Seversen had all been officers of an existing corporation, insolvent and bankrupt, the creditors of which looked on these proceedings with distrust. Freedman was an outsider. The duties of these corporate officers were to protect the creditors of Ridgecrest. But here, conspicuously, there were four violations of their trust obligations: (a) allowing a bidder to believe that a bid of $135,000.00 was not necessary to pay all the corporate debts, (b) refusing to hold the property purchased for the corporation, its stockholders and creditors, (c) accepting property personally from Freedman in part payment, and (d) dealing in the assets of the bankrupt corporation of which they were officers.
 
 
 12
 Fiduciary obligations are imposed upon corporate officers of a concern which is insolvent. They cannot buy claims against it, deal in its stock or traffic in its property. The courts refuse profit on or set aside such transactions even where bankruptcy has not intervened.
 
 
 13
 "The policy of the law is to insure fidelity of trustees to their trusts by making it impossible for them to profitably neglect or abuse them." Bramblet v. Commonwealth Land & Lumber Co., 83 S.W. 599, 602, 26 Ky.Law Rep. 1176, 1179.
 
 
 14
 And the intervention of bankruptcy does not terminate his responsibility as an officer of the corporation. Even if the relationship had ended, the fiduciary capacity was not lost.
 
 
 15
 Sometime in March, 1950, the creditors here involved as appellants made representations to the Referee, claiming that fraud was involved in the transaction. Notwithstanding these suggestions, Miller was allowed until sometime in August to pay the balance of the bid price into the escrow, and a hearing was never had upon the charges thus made.
 
 
 16
 However, the Referee has found that the price paid was adequate and that Miller, Seversen and Vreeland did not receive any profit on resale to Freedman. The Referee also finds as a fact that there was no conspiracy. Upon this basis, therefore, the Court concludes that these findings must be respected and the first ground of attack fails. However, the violation of the obligations of trustees for creditors of the corporation and the deeply divided loyalties may be used in appraisal of the other problems to a consideration of which we now come.
 
 
 17
 The next question is whether the sale to Miller is void because of the express language of Section 29 of the Bankruptcy Act, 18 U.S.C.A. § 154, which provides:
 
 
 18
 "Whoever, being a referee, receiver, custodian, trustee, marshal, or other officer of the court, knowingly purchases, directly or indirectly, any property of the estate of which he is such officer in a bankruptcy proceeding; * * *
 
 
 19
 "Shall be fined not more that $500, and shall forfeit his office, which shall thereupon become vacant."
 
 
 20
 This is a criminal statute. This Court should not decide in a civil case the inclusionary and exclusionary limits of the words used in the Act. It will be time enough to consider such a matter when it is raised in an appropriate setting. As we are reviewing the conduct of these officers of the bankrupt and particularly the acts and position of Miller, we should not intimate as to whether we have any opinion whatsoever upon that question.
 
 
 21
 We now approach the key question whether the sale is void because Miller was a fiduciary. This does not depend upon the statutes relating to bankruptcy nor the principles of bankruptcy law or regulation. Rather, it depends upon the doctrines of the established law of equity, which applies to all fiduciaries, whether they be express trustees, agents or subagents.
 
 
 22
 A review of the facts indicates clearly the position occupied by Miller with reference to the bankrupt estate. The review of the record highlights this situation. Soon after Sampsell was appointed trustee of the bankrupt estate, on June 21, 1947, Miller told Sampsell that Ridgecrest would pull out of bankruptcy and he wanted to conserve expenses, so he volunteered to look after the Ridgecrest properties because he was President and he lived at Ridgecrest. Miller apparently treated this as an employment after June 6, 1947. Several months after the case started, Miller told Sampsell that he would not be able to donate his services. The Trustee told Miller then that he never employed an officer of a bankrupt as an "agent." Sampsell, who obviously did not believe Miller was then his employee, received a direction from the Referee to employ Hancock, who served until November 2, 1949. Seversen wrote to the Referee on November 17, 1947, urging that Miller be retained to look after the Ridgecrest properties. Miller filed a petition January 26, 1948, for compensation for services to the estate from June 6, 1947, to January 6, 1948, at $100.00 per month, and the next day the Referee authorized payment of $700.00 to Miller on account thereof. In April, 1949, Miller, Seversen and Vreeland, as President and directors, petitioned the Referee to continue sale for six months, to enable a buyer to be obtained for $200,000.00. During this period of time, no action was actually taken. In September, 1949, Miller went to the Referee and convinced him that Miller could arrange a satisfactory subdivision program which would be beneficial to creditors. Upon the ex parte petition of Miller, the Referee entered an order which contains the following provisions:
 
 
 23
 "It is Hereby Ordered that D. J. Miller be, and he is hereby appointed the exclusive agent and representative of the trustee appointed herein, and the above entitled bankrupt estate, and he is hereby given the power and authority to do all things necessary in the sub-dividing, leasing and selling of all real property belonging to said estate, subject to the approval of this Court.
 
 
 24
 "It is Further Ordered that the Trustee, Paul W. Sampsell, be, and he is hereby ordered to pay to said D. J. Miller, beginning forthwith as and for his services in connection with the aforesaid appointment the sum of One-Hundred Dollars ($100.00) per month.
 
 
 25
 "It is Further Ordered that said Trustee's Agent, W. E. Hancock, be, and he is hereby restricted in his dealing with said real property to the collection of rents under existing leases, and said agent is hereby restrained from otherwise dealing with or attempting to deal with said real property."
 
 
 26
 Sampsell, the trustee, was aroused by this and filed a petition to vacate the appointment, which came on for hearing, whereupon the Referee made the following order:
 
 
 27
 "It Is Ordered, Adjudged and Decreed that the order appointing D. J. Miller as sales and leasing representatives dated September 9, 1949, wherein D. J. Miller was appointed as exclusive agent and representative of the trustee is hereby vacated and set aside and is to be of no further force and effect.
 
 
 28
 "It Is Further Ordered that D. J. Miller be, and he is hereby employed by the trustee at the sum of $100.00 per month and that he do only those things in connection with the above estate upon written instructions from the trustee or one of the trustee's attorneys, and that he be paid the sum of $100.00 per month, plus 7¢ per mile for traveling expenses and hotel expenses, but that all expenses are to be approved by the undersigned referee; and
 
 
 29
 "It Is Further Ordered, Adjudged and Decreed that the W. E. Hancock services be terminated at the expiration of its present monthly employment."
 
 
 30
 After reciting the terms of these successive orders, the Referee found:
 
 
 31
 "The Referee further finds that at the time of said sale the said D. J. Miller was not the agent of the trustee other than as set forth hereinabove. The Referee further finds that at no time was the said D. J. Miller an officer of the Court herein. The Referee further finds that all of these facts and circumstances pertaining to the services of said D. J. Miller rendered to this estate and to the trustee, were known to the Referee."
 
 
 32
 Miller bid the property January 13, 1950. Sale was confirmed January 23, 1950. Sometime after this, his employment as "exclusive agent" was ended by order dated February 10, 1950. The record does not show that he demanded or was paid the stipulated salary of $100.00 per month.
 
 
 33
 Irrespective of the cryptic finding, Miller did not cease to be the agent of the Trustee with respect to this very property. The recitals of fact show he was an agent and thus a fiduciary for hire of the Trustee and Referee to deal in the same property which was sold to him. It would be a contradiction of the record for this Court to hold that Miller was not an agent of the Referee and Trustee under an appointment in effect at the time of the sale to him. This is not a question of fact, but a question of law upon the written documents and other uncontroverted facts recited by the Referee in his findings. There are three grounds for holding that Miller was charged with responsibility of a trustee in his relation to the bankrupt corporation, its creditors, its property, and the Court: (1) He had recently been an officer of the bankrupt corporation; (2) the obligation grew out of his duty in virtue of his connection with the affairs of the bankrupt corporation while administration was proceeding; and (3) the officers of the court could not deal in the property of the bankrupt and could not authorize their employee, Miller, to do so.
 
 
 34
 Once a corporation is adjudged a bankrupt, the equitable powers of the court are used in accordance with considerations of public policy, which are deeply grounded upon fundamental principles. There the obligations of an officer or director of a corporation to the stockholders and creditors often require drastic measures. As was said by Mr. Justice Douglas in Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L. Ed. 281:
 
 
 35
 "A director is a fiduciary. * * So is a dominant or controlling stockholder or group of stockholders. * * * Their powers are powers in trust. * * * While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation — creditors as well as stockholders."
 
 
 36
 These words are most apt in considering whether Miller, as President of Ridgecrest,[5] was a fiduciary whose obligations to the creditors would be enforced by the bankruptcy court once the corporation entered those portals.
 
 
 37
 Second, the policy of the law relating to courts of bankruptcy to charge with the obligation of utmost good faith is not confined in effect to the narrow circle defined by the criminal statutes, but extends to everyone who is connected with the court or its officers. As was said in the opinion, In re Frazin & Oppenheim, 2 Cir., 181 F. 307, 309:
 
 
 38
 "The application of these principles is not dependent upon the engagement of one person by another in a confidential capacity. There need be no contract of employment at all. There need be no formal relation of trust. The disability grows out of the duty. In our opinion the rule of equity should be so broadly applied as to embrace all persons who have a duty to perform with respect to the property of others and with the proper performance of whose duty the character of a purchaser of such property may be in any degree inconsistent."
 
 
 39
 We recognize that the policy above outlined controls in this case, and that upon this ground alone by virtue of his employment by the officers of the court and his concern with the corporate affairs he was vested with the obligations of a fiduciary.
 
 
 40
 Third, neither the Referee nor the Trustees could personally have acted in these premises. What these officers could not do themselves, they could not authorize one of their agents to do legally.
 
 
 41
 In commenting upon the criminal statute above referred to, Judge McCormick says:
 
 
 42
 "The second gross irregularity, and one which can never be sanctioned by a court of equity, was the purchase by the trustee of property of the bankrupt estate. It was shown by the trustee's report that three articles to wit, a table, a bench, and a typewriter, were purchased by the trustee. The pecuniary value of these articles is small and negligible, and may negative dishonesty, when compared with the magnitude of the estate; but to sanction a transaction wherein a trustee purchases, for himself and for his benefit, property of the trust estate, would do violence to every established principle of trusts, and would invite dishonesty in the relations of trustee and beneficiaries, and imperil the whole scheme of trusts." In re Stephens & Co., D.C., 30 F.2d 725, 726.
 
 
 43
 It may be objected that Miller is thus brought within the policy of a statute which does not in name include him. But the only purpose of this quotation is to show that the Referee and the Trustee could not have performed these acts themselves. Therefore, they would also be liable, irrespective of good faith, if they permitted one of their sub-agents or employees to do any act which they themselves could not do. This is directly decided in the case of Mosser v. Darrow, 341 U.S. 267, 271-272, 71 S.Ct. 680, 682, 95 L.Ed. 927:
 
 
 44
 "These strict prohibitions would serve little purpose if the trustee were free to authorize others to do what he is forbidden. * * * We think that which the trustee had no right to do he had no right to authorize, and that the transactions were as forbidden for the benefit of others as they would have been on behalf of the trustee himself." The considerations of public policy make any person a trustee or fiduciary who has had a connection with any other person or entity or who has been employed or concerned with the affairs of others and thereby acquired a knowledge of the property and concerns of the others. This obligation of the trustee will be enforced by the courts by any methods which are necessary to prevent the appearance of divided loyalties or improper administration.
 
 
 45
 The question of whether the sale was valid or no is easily answered now. A fiduciary cannot purchase property which he is empowered to sell. D. J. Miller was a fiduciary. Property in custody of a court of bankruptcy has a special status and is sacrosanct. No dealings therein will be tolerated which are tainted with the possibility of unfairness or of conflict between personal desires and trust obligations.
 
 
 46
 "The courts of chancery have been astute to protect property actually or potentially within custody from deterioration or interference by any one whether party or stranger. This power is inherent in the court which could not otherwise administer justice or protect litigants or the public." In re Portland Electric Power Company, D.C., 97 F. Supp. 903, 914-916.
 
 
 47
 Where the property is in possession of the bankruptcy court, an interested party need only prove that the purchaser was in a trust relationship with regard to the property itself, the creditors of the estate or the officers of the court, to render the sale void.
 
 
 48
 It was said in the decision, In re Levinson, D.C., 297 F. 490, 493, "Clinton, as trustee, could acquire no title." Therefore, neither Referee nor Trustee in this case, albeit their motives are unquestioned, could authorize Miller to purchase at the sale and, if he did, he acquired no title.
 
 
 49
 "Wilson and Smith are therefore jointly and severally liable for all profits resulting from the purchase; the former although he had no other relation to the estate; the latter, without regard to the fact that he was also counsel for the receiver." Jackson v. Smith, 254 U.S. 586, 589, 41 S.Ct. 200, 202, 65 L.Ed. 418.
 
 
 50
 "In effect, he is not allowed to unite the two opposite characters of buyer and seller, because his interests, when he is the seller or buyer on his own account, are directly conflicting with those of the person on whose account he buys or sells." Michoud v. Girod, 4 How. 503, 555, 45 U.S. 503, 555, 11 L.Ed. 1076.
 
 
 51
 Even if there were full disclosure, adequacy of consideration, absence of secret profit, an open judicial sale will not avail separately or in combination as a defense for such a fiduciary.[6] The prohibition is absolute in the public interest. It is established to protect the courts themselves from suspicion of chicanery.
 
 
 52
 But it is said that the status quo cannot be established, and the innocent will suffer. But this is always a possibility where property in custody of a bankruptcy tribunal is dealt with by unauthorized persons. The record shows that Freedman, even though he may not have entered an unlawful conspiracy, knew all of the essential facts. Besides, the transaction was open and notorious if the version of Miller and Freedman be accepted. The filing of a petition in bankruptcy is a warning to all that property actually or constructively in possession of the court is trust property and is dealt with by everyone at peril. See Bank of California, National Association v. McBride, 9 Cir., 132 F.2d 769.
 
 
 53
 Ordinarily the findings of a Referee, affirmed by a District Court, as this one was, should be respected by the appellate courts. However, the facts show that Miller, a former officer of the bankrupt corporation, acted as a fiduciary with respect to this particular property. He was paid compensation for his services in that regard. Under the circumstances, a sale to him cannot be upheld. It is elementary that a fiduciary cannot deal or receive a transfer of the property which is the subject of the trust. It makes no difference whether the fiduciary be called an agent, custodian, trustee or officer. It makes no difference whether it can be proved that the fiduciary profited by the transaction. The principle is established by general law and does not depend upon the existence of a statute for enforcement. To affirm this sale would seem to place a premium on shady dealings in a court of bankruptcy.
 
 
 54
 The order is reversed and the sale is held void.
 
 
 
 Notes:
 
 
 [1]
 Each of these officers is hereafter referred to without distinction as the "Referee."
 
 
 [2]
 Referred to in the opinion as the "Trustee."
 
 
 [3]
 The finding of the Referee contains the following recital: "D. J. Miller was the president of the bankrupt corporation, and prior to the sale tendered his resignation as president to the said defunct bankrupt corporation." As will be seen hereafter, Miller's fiduciary obligations to the creditors of the corporation were fixed upon insolvency thereof. He could not shed them by resigning. Furthermore, a corporation bankrupt and insolvent is not properly described as defunct
 
 
 [4]
 There was no petition for review filed within ten days under the statute, 11 U.S.C.A. § 67, sub. c. See Pfister v. Northern Illinois Finance Corporation, 317 U.S. 144, 63 S.Ct. 133, 87 L.Ed. 146. Here a hearing was held upon the question of validity of sale many months later in October, which resulted in the order now under review
 
 
 [5]
 If one is charged with fiduciary obligations in the bankruptcy court, he is not relieved of the burden because he resigns office. See Curtis v. Drybrough, D.C., 70 F.Supp. 151
 
 
 [6]
 From the simple finding of the existence of the trust relationship and the transfer, the inference of fraud is compelled as matter of law. There are many other similar situations. Cf. Heath v. Helmick, 9 Cir., 173 F.2d 157, 161-162
 
 
 
 55
 STEPHENS, Circuit Judge.
 
 
 56
 I dissent.
 
 
 57
 Heretofore I prepared an opinion in this case in which I held that there were irregularities in the administration of the estate which, in my opinion derived from a commendable though perhaps unwise effort to reduce expenses and save creditors from losses. My associates were not in agreement with my view, and the opinion by Judge Fee, approved by Judge McCormick, followed.
 
 
 58
 The action of the referee as to Miller's acting as sales agent was unquestionably wrong and never met with the approval of the trustee. However, I cannot find more than a vague suspicion of any crookedness in the administration emanating entirely from the mere possibility that Miller acted unfaithfully. The attack upon the proceedings was long delayed and should not be successful, with the consequent disturbance of land titles based upon court orders, unless positive fraud was both alleged and proved. These requisites seem to me to be lacking. I would affirm.